# United States Court of Appeals for the Federal Circuit

---

**RAYLAND YOUNG,**
*Petitioner,*

v.

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,**
*Respondent.*

---

2011-3232

---

Petition for review of an arbitrator's decision in FMCS no. 111228-52284-6, by Marvin J. Feldman.

---

Decided: February 11, 2013

---

MATTHEW H. SOLOMSON, Sidley Austin, LLP, of Washington, DC, argued for petitioner. With him on the brief was KYLE J. FIET. Of counsel on the brief was JACOB Y. STATMAN, Snider & Associates, LLC, of Baltimore, Maryland.

HILLARY A. STERN, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for respondent. With her on the brief were STUART F. DELERY, Acting Assistant Attorney General, JEANNE E.

DAVIDSON, Director, and BRIAN M. SIMKIN, Assistant Director.

––––––––––––––––

Before PROST, O'MALLEY, and REYNA, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* REYNA. Dissenting opinion filed by *Circuit Judge* PROST.

REYNA, *Circuit Judge.*

Rayland Young seeks review of the arbitrator's opinion and award, dated August 31, 2011, denying his grievance that challenged his termination. For the reasons set forth below, we reverse the arbitrator's decision and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

Mr. Young served as a Public Housing Revitalization Specialist in the Office of Public Housing in the Cleveland, Ohio office of the Department of Housing and Urban Development (HUD). He had been employed by HUD for more than ten years. On August 31, 2010, Mr. Young was representing himself at an arbitration hearing, appealing his five-day suspension for disruptive behavior, misrepresentation of authority, and use of insulting language to and about other employees. One of the witnesses testifying against him was Gregory Darr, the Executive Director of the Coschocton Metropolitan Housing Authority and a HUD client.

Following Mr. Darr's testimony, there was a recess in the proceeding. According to Mr. Darr, while he was walking down the hallway, about 25-30 feet away from Mr. Young, Mr. Young shouted from immediately outside the door of the hearing room, "[y]ou are a racist. You are a member of the KKK, and you should be shot." Mr. Darr

reported that he was shaken by the alleged incident, and he immediately relayed the events to an administrative officer, Reishmemah Haggins, and to the office manager, Doug Shelby. Mr. Darr also insisted on filing a statement with the Federal Protective Service. Mr. Darr did not identify any person who directly witnessed the alleged confrontation. In the days that followed the incident, distress within the office grew as word of the supposed confrontation spread. On September 3, 2010, Mr. Young was placed on administrative leave.

Shawn Sweet, Director of the Cleveland Hub Office of Public Housing prepared a proposal for disciplinary action to be taken against Mr. Young. Ms. Sweet determined that Mr. Young's conduct was similar to Offense Five from the HUD Handbook No. 0752, "[r]ude boisterous, or disruptive conduct; use of insulting, abusive or offensive language to or about other employees," but bordered on Offense Six, "[t]hreatening behavior." His threatening behavior was her key concern in recommending Mr. Young's termination. But the reason Ms. Sweet gave for the punishment she recommended was that he "[made] an aggressive or intimidating statement to an Agency witness at an arbitration hearing." Joint App'x 17.

Once Ms. Sweet issued her notice of proposed removal, Unabyrd Wadhams, Regional Public Housing Director, became the deciding official. Ms. Wadhams reviewed the proposal as well as the notes and supporting documents. She also interviewed several relevant witnesses, including Mr. Darr, Mr. Shelby, Ms. Haggins, and Jimmy Davis. Notably, Ms. Wadhams conducted all of her interviews after Mr. Young submitted his oral and written statements. This meant that Mr. Young was unaware of the content and substance of the interviews and was unable to respond to anything unearthed during those interviews.

Ms. Wadhams found Mr. Darr's account of the incident credible, but its only support came from other individuals who relied on what Mr. Darr had told them about the incident. No witnesses testified that they either saw or heard Mr. Young yell or shout at Mr. Darr. In contrast, Mr. Davis, a HUD employee assisting Mr. Young in the arbitration, submitted an affidavit on behalf of Mr. Young in which he stated, "I was with Mr. Young the entire time during this break. He never approached Mr. Darr and did not make any intimidating or aggressive statements to him. As a matter of fact he never said anything to Mr. Darr." Joint App'x 35. During an interview held after Mr. Young made his submissions, Mr. Davis also testified that Mr. Young was in his view the entire break and that he did not witness Mr. Young scream, threaten, or otherwise interact with Mr. Darr. During the arbitration, HUD stipulated that Thomas Massouras, counsel for HUD at the hearing outside which the incident allegedly occurred, stayed in the hearing room during the entire recess and heard no confrontation or yelling. Consistent with these clear statements, Mr. Young and Mr. Davis maintained that they spent the entire recess outside the hearing room, while Mr. Davis later acknowledged in his interview that the two went to his cubicle during the recess and that he checked email and attended to other matters. Ms. Wadhams determined that this discrepancy wholly undermined Mr. Davis' credibility as a witness and, as a result, Ms. Wadhams determined that Mr. Young engaged in the conduct described in Ms. Sweet's proposal for removal. Mr. Young was never apprised of these supposed inconsistencies, nor did he have a chance to respond to them because the interview only occurred after Mr. Young had fully been heard.

In sustaining the recommendation to remove Mr. Young, Ms. Wadhams explained that she considered this as his second offense (the first being the conduct that gave rise to the five-day suspension). She viewed Mr. Young's

conduct as a very serious threat, and one that was particularly egregious because he directed it at a HUD client. She also explained that the language Mr. Young allegedly used was similar to language he allegedly used on other occasions, including the incident that gave rise to the prior appeal, so she treated those past incidents as evidence of a pattern of misconduct. On the basis of these considerations, Ms. Wadhams concluded that removal was the appropriate measure.

Following Ms. Wadhams' decision, Mr. Young arbitrated his grievance before Marvin J. Feldman. The arbitrator found Mr. Darr's testimony credible while Mr. Davis' testimony was inconsistent and lacking in candor. As for the proposed penalty, the arbitrator also noted that this was Mr. Young's second offense. But when discussing the first incident, the arbitrator described it as "nothing more than the predecessor of the activity involving the instant matter." Joint App'x 12. Finally, regarding Mr. Young's due process arguments, the arbitrator found them unfounded because he had been given adequate time at the end of his arbitration hearing to address them. The arbitrator found the charge against Mr. Young supported by preponderant evidence and denied the grievance. Following the arbitrator's decision, Mr. Young appealed to this court. We have jurisdiction pursuant to 5 U.S.C. §§ 7121(f) and 7703.

## II. STANDARD OF REVIEW

This court reviews an arbitrator's decision, issued pursuant to a negotiated grievance procedure, under the same standard that applies to appeals from the Merit Systems Protection Board. 5 U.S.C. § 7121(f) (2006); *Dixon v. Dep't of Transp.*, 8 F.3d 798, 803 (Fed. Cir. 1993). Under that standard, we must affirm the arbitrator's decision unless it is (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or

regulation having been followed; or (3) unsupported by substantial evidence. 5 U.S.C. § 7703(c); *Dixon*, 8 F.3d at 803. In addition, we must reverse an arbitrator's decision if it is not in accordance with the requirements of the Due Process Clause of the Fifth Amendment or any other constitutional provision. *Cf. Ward v. U.S. Postal Serv.*, 634 F.3d 1274, 1278 (Fed. Cir. 2011).

## III. DISCUSSION

The proceedings leading to Mr. Young's removal present serious concerns related to constitutional due process and observance of agency procedures, both of which the arbitrator failed to adequately address. In that order, we explain why each concern amounts to a violation and requires reversal.

## A. Due Process

Procedural due process requires that certain substantive rights—including the property interest established by certain kinds of federal employment—cannot be deprived unless constitutionally adequate procedures are followed. *Stone v. Fed. Deposit Ins. Corp.*, 179 F.3d 1368, 1375 (Fed. Cir. 1999) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985)). Applicable to this case are "[t]he essential requirements of due process, . . . notice and an opportunity to respond." *Id.* at 1375-76 (quoting *Loudermill*, 470 U.S. at 546). As such, an employee is entitled to notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story before termination. *Id.* at 1376 (quoting *Loudermill*, 470 U.S. at 546); *see also Douglas v. Veterans Admin.*, 5 M.S.P.R. 280, 304 (1981).

When an employer obtains new and material information through *ex parte* communications, an "employee's constitutional due process guarantee of notice (both of the charges and of the employer's evidence) and the opportunity to respond" are undermined. *Stone*, 179 F.3d at

1376. Where an employee has notice only of certain charges or portions of the evidence and the deciding official considers new and material information, procedural due process guarantees are not met because the employee is no longer on notice of the reasons for dismissal and/or the evidence relied upon by the agency. *Id.*

As we observed in *Stone*, not every *ex parte* communication is a procedural defect that is so substantial and so prejudicial as to undermine the due process guarantee and require an entirely new administrative proceeding. Rather, "only *ex parte* communications that introduce new and material information" to the deciding official violate the due process guarantee of notice. *Id.* at 1377.

In *Stone*, we identified several useful factors to consider when determining if new and material information has been introduced by means of *ex parte* contacts: (1) whether the *ex parte* communication introduces "cumulative" information or new information; (2) whether the employee knew of the communication and had a chance to respond; and (3) whether the *ex parte* communication resulted in undue pressure upon the deciding official to rule in a particular manner. *Id.* Where "the *ex parte* communication is so substantial and so likely to cause prejudice that no employee can fairly be required to be subjected to a deprivation of property under such circumstances," a due process violation has occurred and the former employee is entitled to a new constitutionally correct removal procedure. *Id.* Such a violation is not subject to the harmless error test. *Id.* (citing *Sullivan v. Dep't of the Navy*, 720 F.2d 1266, 1274 (Fed. Cir. 1983)).

Under the first *Stone* factor, HUD argues that the deciding official uncovered cumulative, rather than "new and material," information during her investigatory interviews of Mr. Darr, Mr. Shelby, Ms. Haggins, and Mr. Davis. HUD maintains that *Blank v. Department of the Army*, 247 F.3d 1225 (Fed. Cir. 2001), authorizes such

interviews to "confirm and clarify information that was already contained in the record." *Id.* at 1229.

We are convinced that the *ex parte* communications in this case were more than "confirming and clarifying information" that was already on the record because the deciding official described the *ex parte* communication as a "huge" departure from written statements already on the record. The deciding official also admitted that the *ex parte* communications were the most critical statements in her mind. The significant and overwhelming role that the new communication played in the termination decision makes it evident that the *ex parte* communications introduced new and material information as understood under the first *Stone* factor.

As we observed in *Ward*—a case very similar to this one—the third *Stone* factor, undue pressure, is less relevant to determining whether the *ex parte* communications deprived the employee of due process where, as here, the deciding official admits that the *ex parte* communications influenced her determination. 634 F.3d at 1280 n.2. Based on record admissions regarding the significance of the *ex parte* communications, the first *Stone* factor strongly suggests a due process violation while any deficiency of the third factor is less significant.

We also find HUD's reliance on *Blank* misplaced for another reason. In that case, the Board actually analyzed the allegedly improper *ex parte* communications under the *Stone* factors, and this court found those findings supported by substantial evidence. *Blank*, 247 F.3d at 1229. In this case, the arbitrator performed no due process analysis whatsoever. *Cf. Stone*, 179 F.3d at 1377. Instead, the arbitrator merely noted that "[Mr. Young] received a full disclosure by the employer when requested . . . . [and] . . . was given, at the end of the hearing, sufficient time to reflect on his activities in the case." Joint App'x 15. But the opportunity "to reflect on his

activities" post-termination does not address whether Mr. Young had notice and an opportunity to be heard at the investigation stage. Instead, the controverted *ex parte* contacts arose after Mr. Young had made his written and oral statements to the deciding official. Mr. Young had no opportunity to respond to the allegedly inconsistent statements Mr. Davis had made only in his *ex parte* interview with the deciding official before the deciding official rendered her decision. This defect during the investigation stage more than satisfies the second *Stone* factor considering that Mr. Young neither learned of the *ex parte* communication, nor had an opportunity to respond to it before the deciding official. We also note the likelihood that any response from Mr. Young would have been meaningful in addressing the allegedly inconsistent statements. Given the layout of the HUD offices, the proximity of the hearing room to Mr. Davis's cubicle, and the sworn testimony that Mr. Young was in view of Mr. Davis at all times, the perceived inconsistency in Mr. Davis's statements appears easily reconcilable.

Mr. Young was entitled to "procedural fairness at each stage of the removal proceedings," not just upon review of the termination decision. *Stone*, 179 F.3d at 1376. No amount of time for reflection can excuse past due process violations. "[W]hen these rights are undermined, [he] is entitled to relief regardless of the stage of the proceedings." *Id.* We conclude as a matter of law that the *ex parte* communications from this case were so substantial and so likely to cause prejudice that no employee can fairly be required to be subjected to a deprivation of property under these circumstances. *Id.* at 1377. A due process violation has occurred and Mr. Young is entitled to a new constitutionally correct removal procedure.[1]

---

[1] The dissent accuses the majority of wearing blinders in our review of the termination proceeding. The problem with this perspective is that the dissent, like the

## B. Violation of Agency Procedures

Even if Mr. Young's due process rights had not been violated, the deciding official's conduct resulted in a harmful procedural error requiring reversal. *Cf. Ward*, 634 F.3d at 1281. Applicable regulations instruct the deciding official to "consider only the reasons specified in the notice of proposed action and any answer of the employee" in arriving at a removal decision. 5 CFR § 752.404(g)(1) (2012). Similarly, HUD's Adverse Actions Handbook explains that a deciding official's "decision must be based on the evidence relied upon to support the proposal, and not on '*ex parte*' (with only one side present) communications; i.e., conversation that provides additional evidence that is not provided to the employee for comment or response." Dep't of Housing and Urban Dev. Admin., Handbook 0752.02 REV-3, Adverse Actions (Dec. 1, 2000). "It is a procedural error . . . for 'an agency to rely on matters . . . without including those matters in the proposal notice.'" *Ward*, 634 F.3d at 1281 (quoting *Coleman v. Dep't of Defense*, 100 M.S.P.R. 574, 579 (2005)). Accordingly, because the deciding official relied on *ex parte* communications that were not part of the original proposal for removal, HUD committed procedural error. *Id.*

---

deciding officer below, starts from the position that Mr. Young indisputably engaged in the behavior of which he is accused, relying on prior experiences, the truth and veracity of which were not adjudged below or brought on appeal. *See, e.g.*, dissent at 2 ("Young is not a stranger to disciplinary proceedings."); *see also id.* at 2 n.1 (crediting the unsubstantiated "fears" of Mr. Young's co-workers). Thus, the dissent concludes that the *ex parte* communications were harmless procedural errors that merely "confirmed" Mr. Young's behavior. We believe the record evidence on that point is sufficiently in dispute that Mr. Young's due process rights must be safeguarded.

## C. Evidence of Prior Misconduct

Finally, we believe that the deciding official and the arbitrator erred in basing their decisions—in part—upon similar instances of past misconduct. In particular, the deciding official explained that she found "Mr. Darr's report . . . credible because the language he reported [Mr. Young] using is similar to language that the record shows [he] . . . used on other occasions, including those which have been the basis for prior discipline." Joint App'x 22. Similarly, the arbitrator noted that "[t]here is no doubt in th[e] writer's mind [Mr. Young] was responsible for the commentary to Darr at the time and place complained of. [Mr. Young's] alleged activity was nothing more than a continuation of his behavior pattern that has followed the course of his presidency at the Cleveland HUD agency office." *Id.* at 11.

The Board has previously held that, while prior misconduct may be considered in determining the appropriateness of a penalty or impeaching credibility where the prior misconduct relates to the propensity for honesty, reliance on prior conduct to prove whether the petitioner engaged in the same conduct on another occasion is inappropriate. *See Carrick v. U.S. Postal Serv.*, 67 M.S.P.R. 280, 283, *aff'd*, 69 F.3d 555 (Fed. Cir. 1995); *see also Bennett v. Dep't of the Air Force*, 84 M.S.P.R. 132, 138 (M.S.P.B. 1999); *Hawkins v. Smithsonian Inst.*, 73 M.S.P.R. 397, 403 (M.S.P.B. 1997). Similarly, in *Ibrahim v. Department of the Army*, 30 M.S.P.R. 531, 536 (1986), the Board, looking to Federal Rule of Evidence 404(a) for guidance, stated that "[t]he basic rule is that character evidence may not be introduced circumstantially to prove the conduct of the witness." We agree. While the Federal Rules of Evidence do not apply to Board hearings, we have found them to be a helpful guide to proper hearing practices. *Yanopoulos v. Dep't of Navy*, 796 F.2d 468, 471 (Fed. Cir. 1986). On remand, Mr. Young's past misconduct should not be used to prove charges that have been

asserted against him in this case. Mr. Young's identity is not at issue here and the government's reliance on Federal Rule of Evidence 404(b) to excuse this use of character evidence is without merit.

## IV. CONCLUSION

Because we conclude that Mr. Young's due process rights have been violated and that the agency violated its own procedures, we reverse the arbitrator's decision and remand for further proceedings consistent with this opinion. Given this disposition, we need not address the other grounds for relief asserted by the petitioner.

## REVERSED AND REMANDED

### COSTS

No costs.

# United States Court of Appeals
# for the Federal Circuit

---

**RAYLAND YOUNG,**
*Petitioner,*

**v.**

**DEPARTMENT OF HOUSING AND URBAN
DEVELOPMENT,**
*Respondent.*

---

2011-3232

---

Petition for review of an arbitrator's decision in FMCS
no. 111228-52284-6, by Marvin J. Feldman.

PROST, *Circuit Judge*, dissenting.

I disagree with the majority that Young's termination
amounted to a violation of his due process rights. In my
opinion, Young received all the process he was due—and
more. The majority views the termination proceedings
with blinders, focusing solely on one particular portion of
Wadhams's investigation without considering the exten-
sive pre- and post-termination proceedings that Young
received. In doing so, the majority creates an unneces-
sarily stringent due process standard that bumps up
against Supreme Court precedent and opens the door to
meritless claims by duly-terminated employees. For these
reasons, I respectfully dissent.

## I

Young is not a stranger to disciplinary proceedings. The alleged conduct at issue in this case occurred during an earlier arbitration proceeding in which Young was contesting a five-day suspension for allegedly engaging in disruptive behavior when he did not receive a specific desk. J.A. 6. One of HUD's witnesses at that earlier proceeding was Gregory Darr, who happened to be visiting HUD's Cleveland Field Office when Young had engaged in the behavior upon which his five-day suspension had been based. While questioning Darr during that proceeding, Young, on the record, asked Darr whether he was a racist. Young later allegedly told Darr during a break in the same proceeding, "You are a racist, you are a member of the Ku Klux Klan and you should be shot."[1] J.A. 17. Based on this latter statement, Shawn Sweet proposed Young's removal, and Young ultimately was terminated.

## II

Under *Cleveland Board of Education v. Loudermill*, an agency's pre-termination proceedings need only afford the employee "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." 470 U.S. 532, 547 (1985). These proceedings "need not definitely

---

[1] Indeed, in response to Young's alleged statement during the break, his coworkers "expressed elevated concern in the possibility that Mr. Young's unpredictable behavior will become violent." J.A. 13. In fact, one coworker stated that "people here are scared, and their feelings are becoming more intensified because of the behavior of Mr. Young. They are afraid of him. . . . This is no way to work. No one should come into work fearful of what might happen if Mr. Young shows up and gets angry." J.A. 14.

resolve the propriety of the discharge" but are only "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Id.* at 545-46. Here, Young received all the process to which he was entitled. The notice of proposed removal informed Young that his removal was based on the statement he allegedly made to Darr. It further noted that there was evidence that Darr was visibly shaken by Young's alleged statement and that Darr had complained to the Field Office Manager. J.A. 17. Young was then given an opportunity to respond to this charge prior to his termination. Ultimately, Young's termination was based on the precise charge for which he was accorded an opportunity to respond. In my opinion, these pre-termination proceedings undoubtedly provided enough process to allow Wadhams, the deciding official, to determine whether there were reasonable grounds to believe that Young made the alleged statements and whether termination was the appropriate penalty.

The majority, however, concludes that these pre-termination proceedings were insufficient because Young did not have an opportunity to respond to the evidence uncovered during Wadhams's ex parte pre-termination investigation. As we have previously recognized, however, "not every *ex parte* communication is a procedural defect so substantial and likely to cause prejudice that it undermines . . . due process." *Ward v. U.S. Postal Serv.*, 634 F.3d 1274, 1279 (Fed. Cir. 2011) (quoting *Stone v. FDIC*, 179 F.3d 1368, 1376-77 (Fed. Cir. 1999)). Instead, "the ultimate inquiry is whether the ex parte communication is 'so substantial and so likely to cause prejudice that no employee can fairly be required to be subjected to a deprivation of property under such circumstances.'" *Id.* (quoting *Blank v. Dep't of the Army*, 247 F.3d 1225, 1229 (Fed. Cir. 2001)).

Here, I cannot accept that the identified ex parte communications created such prejudice to Young that his due process rights were violated. Young argues that these ex parte communications—particularly Wadhams's communications related to Davis's alibi for Young—led Wadhams to discount Davis's affidavit, an affidavit which Young himself had submitted to support his response to the proposed notice of removal. *See* Young Br. 22 ("In particular, Ms. Wadhams discounted Mr. Davis' affidavit upon information she obtained *ex parte* from Mr. Davis and other HUD employees she interviewed, and this information was *pivotal* to her decision to sustain the charge against Mr. Young."). The ex parte communications, therefore, did not result in new and material information to support the charge against Young, but merely followed up on Young's own evidence. That is, Young was informed of the specific charge against him, had an opportunity to respond to the charge, and was ultimately removed based solely on that charge. Nevertheless, Young is arguing that he had a right to know—before his termination—whether the deciding official would credit his evidence. This is not the law.

Furthermore, to the extent that Young is arguing that Wadhams's additional communications with HUD employees violated his due process rights, those communications simply confirmed what was already noted in the proposed notice of removal: Darr was visibly shaken after the alleged encounter with Young. J.A. 17. Where, as here, the deciding official interviews other agency employees "merely to confirm and clarify information that was already in the record . . . there is no due process violation." *Blank*, 247 F.3d at 1229. Consequently, on this record, I am unwilling to conclude that Wadhams's ex parte communications were "so substantial and so likely to cause prejudice" that they amounted to a due process violation.

Even assuming Wadhams's ex parte investigation did taint the pre-termination proceedings, the post-termination hearings before the arbitrator decidedly cured any procedural due process deficiencies. Our sister circuits, applying *Loudermill*, have recognized that "extensive post-termination proceedings may cure inadequate pre-termination proceedings." *Krentz v. Robertson Fire Prot. Dist.*, 228 F.3d 897, 902 (8th Cir. 2000); *Schacht v. Wisconsin Dep't of Corrections*, 175 F.3d 497, 503 (7th Cir. 1999) ("[Plaintiff's] procedural due process claim fails . . . because, even if he could prove his claim, he had adequate post-termination administrative remedies he could have pursued."). In this case, the arbitrator held a four-day hearing during which Davis testified and Young had an opportunity both to present his side of the story and to cross-examine HUD's witnesses. The arbitrator was not persuaded by Young's version of the events and instead credited Darr's testimony. We owe the arbitrator's determinations the same deference that we apply to decisions from the Board. *See* 5 U.S.C. § 7121(f); *Frank v. Dep't of Transp.*, 35 F.3d 1554, 1556 (Fed. Cir. 1994).

## III

I also disagree with the majority's determination that Wadhams's conduct violated agency policy and somehow "resulted in a harmful procedural error requiring reversal." Maj. Op. at 10. As an initial matter, it is unclear whether HUD's Adverse Actions Handbook is actually binding on the agency. *See Farrell v. Dep't of the Interior*, 314 F.3d 584, 590 (Fed. Cir. 2002) ("The general consensus is that an agency statement, not issued as a formal regulation, binds the agency only if the agency intended the statement to be binding." (citations omitted)). But even if it were, Wadhams's ultimate decision was not "based on" her ex parte communications. Nor did Wadhams rely on these communications to glean additional reasons for terminating Young in violation of 5 CFR § 52.404(g)(1). Rather, the communications here were

merely an attempt to confirm and clarify information—submitted by Young—that was already contained in the record. In my view, such communications do not amount to procedural error, let alone harmful procedural error.

Finally, neither the arbitrator nor Wadhams improperly relied upon Young's prior misconduct. While the arbitrator did mention it, there is no indication that this recognition played any role in his conclusion that the agency proved the charge at issue here. Indeed, before discussing Young's past behavior pattern, the arbitrator had already concluded that "[t]here is no doubt in this writer's mind that the grievant was responsible for the commentary to Darr at the time and place complained of." J.A. 11. Similarly, Wadhams's decision letter expressly recognized "that the sustained charge, standing alone, regardless of [the] first or second offense, is sufficient to justify [Young's] removal." J.A. 23.

## IV

In sum, let us be clear: Wadhams did not rely upon her ex parte communications to bring additional charges against Young, or even to provide additional proof that Young committed the misconduct specifically charged here. Rather, she relied upon these communications merely to confirm and clarify information that was already contained in the record. That is not a violation of due process. We should defer to the arbitrator's assessment of Young and his claim and affirm. I respectfully dissent.