Richard FRANK, Petitioner,

v.

**DEPARTMENT OF TRANSPORTATION, FEDERAL AVIATION ADMINISTRATION, Respondent.**

No. 93–3510.

United States Court of Appeals, Federal Circuit.

Sept. 16, 1994.

Rehearing Denied; Suggestion for Rehearing In Banc Declined Oct. 26, 1994.

Jonathan G. Axelrod, Beins, Axelrod, Osborne, Mooney & Green, P.C., of Washington, DC, argued for petitioner. With him on the brief was William W. Osborne, Jr. Also on the brief was James C. Marin, National Air Traffic Controllers Ass'n, MEBA, AFL–CIO, Washington, DC, of counsel.

Joseph A. Kijewski, Dept. of Justice, of Washington, DC, argued for respondent. Of counsel were Bryan G. Snee and David Cohen.

Before NEWMAN, LOURIE, and SCHALL, Circuit Judges.

SCHALL, Circuit Judge.

Richard Frank petitions for review of the July 23, 1993 decision and award of the arbitrator in Grievance No. NC–AEA–93–38–POU–1 (Decision and Award). The arbitrator sustained the adverse action of the Department of Transportation (DOT), Federal

Aviation Administration (agency), removing petitioner from his position as Air Traffic Control Specialist for tampering, adulterating, or substituting a urine specimen during a random drug test. We affirm.

## BACKGROUND

Petitioner was employed by the agency as an Air Traffic Control Specialist at the Dutchess County Tower in New York. On December 18, 1992, while he was working a 7:00 A.M. to 3:00 P.M. shift, he was informed that he had been randomly selected to be drug tested that day. Around noon, petitioner was brought to a collection site, which consisted of a "paperwork area" in a conference room and the men's restroom across the hall. Petitioner was asked to produce a urine specimen. He was unable to produce a specimen at that time, however, and was rescheduled for later in the day. A couple of hours later, petitioner returned to the collection site. At that time, he was given a specimen kit and led to the restroom. Contrary to agency regulations, the faucets in the restroom had not been taped to prevent them from being turned on, and bluing agent had not been added to the toilets.[1]

Petitioner was in the restroom unsupervised for about ten minutes,[2] after which time he emerged with a small amount of fluid in his specimen cup. One of the two specimen collectors on duty from Olsten Healthcare, Mr. Dominick Scalercio, obtained the sample and immediately observed that a temperature indicator on the specimen cup read 88 degrees Fahrenheit, the lowest reading capable of measurement. Samples must be within the range of 90.5 to 99.8 degrees Fahrenheit to be indicative of origin within the human body. A temperature outside this range suggests tampering. Mr. Scalercio immediately notified Ms. Sandra O'Connor, the collector in charge, and reported that petitioner's specimen was out of range. Ms. O'Connor confirmed the 88 degree reading and immediately thereafter transferred petitioner's specimen into a second collection cup

to ensure the temperature indicator on the first was not faulty. The temperature indicator on the second cup failed to register altogether, indicating that the sample had a temperature of less than 88 degrees Fahrenheit. Then, Ms. O'Connor testified, she and Mr. Scalercio poured the specimen into a bottle and sealed it, whereupon the petitioner initialed the seal.

Ms. O'Connor then discussed the problem presented by petitioner's sample with Mr. Anthony Capaldi, who was the facility manager in charge of the drug testing program and was at the collection site at the time. After checking some manuals in the paperwork area, Ms. O'Connor and Mr. Capaldi went to Mr. Capaldi's office, which was just next door to the conference room, so that they could telephone and obtain guidance from DOT's drug program coordinator, Dr. Mary Lewis, who works out of Kennedy Airport. When they went to Mr. Capaldi's office, Ms. O'Connor and Mr. Capaldi left Mr. Scalercio and petitioner alone in the conference room with the sealed sample. After waiting a few minutes, petitioner left the conference room and started toward Mr. Capaldi's office where Mr. Capaldi and Ms. O'Connor were still on the telephone with Dr. Lewis. Mr. Scalercio followed petitioner without taking the sealed specimen container. When Ms. O'Connor saw petitioner and Mr. Scalercio in the hall outside Mr. Capaldi's office, she told them to return to the specimen, which they did.

In due course, Mr. Capaldi requested of petitioner that he remain at the collection site to provide another specimen. Further, because it was now about 3:00 P.M., Mr. Capaldi told petitioner that the agency would pay him overtime for the time needed for the retesting. Petitioner declined to be retested at that time, relating that he was needed at home to take care of his children. Then, after being told by Mr. Capaldi that he was free to leave, petitioner left to go home.

---

1. The faucets had been taped and the toilets had bluing agent in them during petitioner's earlier attempt to provide a specimen.

2. The government tells us that petitioner was unaccompanied in the restroom so as to respect

his privacy. If the restroom in the collection site contains individual stalls, a collector must accompany the donor into the restroom and wait outside the stall. However, where, as in this case, the restroom has no stalls, the collector waits outside the restroom.

Petitioner left without signing the required chain-of-custody form. A donor is required to sign a chain-of-custody form certifying that a sample is the donor's and that information on the form regarding the sample is correct. Failure to do so is to be noted on the form by the collector. Ms. O'Connor, who was still on the telephone with Dr. Lewis, realized that petitioner had not signed the form, but by the time she did so, petitioner had already left the facility. Per Dr. Lewis's instructions, Ms. O'Connor had Mr. Scalercio note on the form what had occurred.

The agency sent petitioner's specimen to an outside testing laboratory, which determined that the sample was not urine, but water. The agency subsequently removed petitioner from his position for submitting an adulterated specimen. Following his removal, petitioner filed a grievance in accordance with the terms of the labor relations agreement between his union and the agency (Agreement). After a hearing and the submission of briefs, the arbitrator denied the grievance, thus sustaining the agency's removal action.

## OPINION

### I. *Standard of Review*

Under Article 10, Section 2 of the Agreement, a removal by the agency must be supported "by a preponderance of the evidence." This is the same standard of proof that is required in an appeal of an adverse personnel action before the Merit Systems Protection Board (Board). 5 U.S.C. § 7701(c) (1988).

We review the arbitrator's decision under the same narrow standard that applies to appeals from the Board. 5 U.S.C. § 7121(f) (1988); *Cornelius v. Nutt*, 472 U.S. 648, 652, 105 S.Ct. 2882, 2885, 86 L.Ed.2d 515 (1985); *Dixon v. Department of Transp.*, 8 F.3d 798, 803 (Fed.Cir.1993). Thus, we affirm the arbitrator's decision unless it is (1) arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence. 5 U.S.C. § 7703(c) (1988); *Dixon*, 8 F.3d at 803. Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. National Labor Relations Bd.*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938).

### II. *Analysis*

#### A.

■ Petitioner's first challenge to the arbitrator's decision focuses on the agency's failure to adhere to DOT Order 3910.1B, which requires keeping the specimen and chain of custody forms under the control of the collector. Petitioner primarily relies upon the fact that his specimen was left unattended in the conference room for a short period of time, in direct violation of DOT procedures.[3] The arbitrator concluded that this violation did not harm or prejudice petitioner because there was no evidence that any other person was in the conference room or had access to the room during the short period of time that the specimen was left unattended. Decision and Award, at 11–12. Petitioner argues that the arbitrator erroneously required that petitioner prove that someone else tampered with the specimen while it lay unattended. Petitioner further argues that the agency should have been required to prove perfect compliance with its procedures because any non-compliance is *per se* harmful and prejudicial error that is sufficient to invalidate a drug test. Essentially, we understand petitioner to be arguing that the failure of the agency to follow certain of its drug testing procedures should be deemed to have undermined the chain of custody over the specimen, thus rendering

---

3. The DOT's directive regarding a drug-free departmental workplace provides that "[t]he collector and the individual providing the specimen shall always have the specimen within sight prior to being sealed and labeled." DOT Order 3910.-1B, Chapter III–8–a(4) (Oct. 23, 1991). In addition, DOT's Drug Testing Guide provides that "[b]oth the individual being tested and the collector should keep the specimen in view at all times

until it has been packaged and sealed for shipment." DOT Drug Testing Guide, Chapter II–B–1–m (Nov. 30, 1991). As noted above, Ms. O'Connor testified that she observed Mr. Scalercio pour the specimen into a bottle and seal it in the presence of petitioner, who initialed it. Thus, there does not appear to be an issue of compliance with DOT Order 3910.1B.

the evidence supporting the arbitrator's decision insubstantial. We disagree.

■ By no means do we wish to trivialize the importance of the chain of custody over specimens, as well as the procedures necessary to ensure the chain is not broken. We are not prepared to say, however, that a violation of procedures automatically and fatally undermines the chain of custody. Each case must be considered on its own merits. The chain of custody must be strong enough so that, on the record as a whole, the decision of the arbitrator can be found to be supported by substantial evidence. *Dixon*, 8 F.3d at 804. Moreover, where there is procedural error on the part of the agency, the error does not require that the agency decision be overturned unless the error is shown to have been harmful. 5 U.S.C. § 7701(c)(2)(A) (1988).[4] Thus, we do not think that the adoption of the *per se* standard urged by petitioner is warranted.

With regard to the chain of custody in this case, the arbitrator found that the violation of DOT chain-of-custody procedures did not harm or prejudice petitioner because there was no evidence that any other person had access to the specimen during the short time it was left unattended. Decision and Award, at 12. In other words, there was no evidence that someone other than petitioner had tampered with the specimen while it lay unattended. Substantial evidence supports this finding. First, there is substantial evidence that the specimen container was sealed *before* it was left unattended. In this regard, Ms. O'Connor testified that it is the policy of Olsten Healthcare that after visual and temperature observations of the specimen in the collection cup are made, the specimen is immediately poured into a specimen container which is then sealed. She also testified that this is what was done with petitioner's specimen.[5] Later in her testimony, Ms. O'Connor made a statement that suggested the specimen was not sealed before it was left unattended. This statement was made while Ms. O'Connor was testifying about receiving instructions from DOT's drug program coordinator, Dr. Lewis, and about realizing that petitioner had left the facility without signing the custody-and-control form. Ms. O'Connor testified that she:

> followed her [Dr. Lewis's] instructions from there which was to take the urine sample with Mr. Capaldi—with Mr. Scalercio into the conference room, into the paperwork area, note on the custody form what had occurred, *seal the bottle. I mean the bottle's already sealed.* Put the bottle into the plastic bag that you close and then you put that in with the drug custody form, the sections that should go to the lab. Put those in the box, seal the box.

We cannot say that her statement emphasized above was anything more than a misstatement, which she immediately and without any prompting corrected. As such, we do not think that this misstatement undermines her earlier testimony, where she explained in detail when and how the specimen was sealed in the container.

The only other evidence in the record that contradicts Ms. O'Connor's testimony that the specimen was in the container and sealed before it was left unattended is the petitioner's testimony before the arbitrator. Petitioner testified as follows:

> **A** THE WITNESS [Petitioner]: .... At this point, the both of us [Mr. Scalercio and petitioner] went back there [the conference room where the specimen was unattended] and, at that point, I initialed the tag for the sample bottle.
>
> **Q** BY MR. MORIN [Representative of petitioner's union]: Where was the tag?
> **A** Well, when I initialed the tag, it was on the form that I believe they peeled it off. Now, I don't remember where the tag came from, to be honest with you.
> **Q** But the tag was not on the bottle?
> **A** No, not that I recall.

Thus, what we have is one person's word (Ms. O'Connor's) against another's (petitioner's). We note that on this particular point—whether the specimen was sealed in a

---

**4.** Section 7701(c)(2)(A) provides that "the agency's decision may not be sustained ... if the employee ... shows harmful error in the application of the agency's procedures in arriving at such decision."

**5.** Ms. O'Connor's testimony was consistent with her January 11, 1993 report.

container before it was left unattended—the arbitrator made no finding. Nevertheless, the arbitrator did find that there was no evidence that anyone else had access to the sample while it lay unattended. Decision and Award, at 12. This finding is supported by the substantial evidence that the sample was sealed before it lay unattended (Ms. O'Connor's testimony), in combination with the absence of any evidence that there was any tampering with the seal before it arrived at the testing laboratory.

Moreover, the arbitrator's finding that petitioner was not harmed or prejudiced by the chain-of-custody violation is further supported by evidence regarding the briefness of the time the sample lay unattended, as well as the shortness of the distance that Mr. Scalercio and petitioner strayed from the sample. Petitioner himself testified that he and Mr. Scalercio were only away from the sample for "about a minute." Also, it is undisputed that Mr. Capaldi's office, the place where Mr. Scalercio and petitioner strayed, is just next door to the conference room.[6]

Petitioner points to other errors in the collection process: (1) the fact that, contrary to DOT procedures, the restroom had not been secured against the possibility of adulteration before petitioner entered it the second time; (2) the fact that the collectors failed to note on the custody and control form certain "unusual behavior" of petitioner

(that petitioner appeared nervous, in that when he gave his specimen cup to Mr. Scalercio, his hand was shaking), as they were required to do; and (3) the fact that the custody and control form was not signed by petitioner before he left the facility. Petitioner claims that the removing officer was unaware of these anomalies, and that if he had been aware of them, he would not have removed petitioner. We are not persuaded. Petitioner was removed because it was found that he had submitted a specimen that was not urine. Substantial evidence supports the finding that the specimen petitioner submitted was not urine. None of the asserted errors have any bearing on this finding; thus, petitioner has failed to show that he was prejudiced or harmed by the asserted errors.[7]

Accordingly, petitioner's complaints regarding chain of custody and the collection procedures do not warrant reversal of the removal action.

### B.

Petitioner next argues that we must overturn his removal because the agency violated his union representation rights. Federal employees enjoy a statutory right to union representation, upon request, at investigatory interviews with agency representatives whenever the employee reasonably believes disciplinary action may result. 5 U.S.C.

6. Petitioner makes much of the fact that Mr. Scalercio testified that a "lot of people" were in the collection area at the time the specimen was left unattended. The record reflects, however, that the "lot of people" to which petitioner refers were Mr. Capaldi, Ms. O'Connor, Mr. Scalercio, petitioner, and possibly one other would-be donor. There is no suggestion that these people tampered with the specimen, or even had any opportunity or motive to do so during the very brief time that the specimen lay unattended.

7. The problems with the chain of custody in the present case do not rise to the level of those in *Dixon*, where we held that the arbitrator's finding that Dixon submitted a sample of water to the on-site collector was not supported by substantial evidence. 8 F.3d at 806. In *Dixon*, the collector had taped the water faucets in the restroom sink and had poured blue dye into the toilet. *Id.* In addition, the on-site collector did not find any problem with the sample Dixon submitted to him. Dixon's temperature strip in-

dicated that his sample was in the acceptable temperature range, and the on-site collector testified that the color of the sample "looked okay" to him. *Id.* At the same time, there was no indication that Dixon had with him the kind of apparatus that would have been required in order to make a specimen that was not urine have a temperature that was in the acceptable temperature range. *Id.* at 806. In the present case, however, the problem with petitioner's sample was discovered immediately upon petitioner giving his sample to Mr. Scalercio, one of the on-site collectors. Finally, in *Dixon*, unlike in the present case, there were two additional problems: (1) there was evidence, in the form of a wrinkled label, suggesting that the specimen container's seal had been tampered with before the container was opened by testing laboratory personnel; and (2) the testing laboratory receiving clerk, who first identified the problem with the color of the sample, was not identified on the custody-and-control form, and thus could not provide testimony. *Id.* at 806–08.

§ 7114(a)(2)(B) (1988); *see also National Labor Relations Bd. v. J. Weingarten, Inc.*, 420 U.S. 251, 263, 95 S.Ct. 959, 966–67, 43 L.Ed.2d 171 (1975). Employees can bargain and modify their statutory rights to some extent through collective bargaining. *See* 5 U.S.C. § 7106(b)(2) (1988); *Cornelius*, 472 U.S. at 652, 659, 105 S.Ct. at 2885, 2889.

■ Petitioner argues that his union representation rights were violated in two respects. First, he contends that when the specimen collectors found problems with his specimen at the collection site on December 18, 1992, the agency was required at that time to advise him of his right to union representation.[8] Petitioner has raised this argument for the first time, however, in his petition to this court. We do not address petitioner's argument as we do not consider issues that were not raised in the proceedings below. *Oshiver v. Office of Personnel Mgt.*, 896 F.2d 540, 542 (Fed.Cir.1990) ("Our precedent clearly establishes the impropriety of seeking a reversal of the board's decision on the basis of assertions never presented to the presiding official or to the board." (quoting *Rockwell v. Department of Transp.*, 789 F.2d 908, 913 (Fed.Cir.1986))); *Allred v. Department of Health and Human Servs.*, 786 F.2d 1128, 1130 (Fed.Cir.1986) (holding that the issue of notice of petitioner's proposed suspension "has not been preserved and is not before this court" because petitioner "failed to show that that argument was presented to the presiding official").[9]

■ Second, petitioner argues, as he did before the arbitrator, that his union representation rights were violated on January 15, 1993, when an agency Medical Review Officer (MRO) telephoned petitioner to question him about the problem with the specimen. It is undisputed that the MRO telephoned petitioner before he had been advised of his union representation rights.[10] According to petitioner, it was only when the MRO began to question him about the events of December 18, 1992, that he realized the substance of the charges that could possibly be brought against him. At that point, thinking that he needed to speak with a union representative or his manager, petitioner asked the MRO if he could telephone her at a later time. The MRO agreed and the telephone conversation ended. Petitioner then telephoned his union representative. The arbitrator found that, even accepting petitioner's version of the facts, petitioner was not harmed or prejudiced by not having union representation during his brief conversation with the MRO. Decision and Award, at 12 n. 5. This finding is supported by substantial evidence. Petitioner was removed for submitting an adulterated specimen. Nothing resulting from the telephone conversation was relied upon by the agency in taking the removal action.

**8.** Article 6, Section 1 of the Agreement provides in pertinent part: "If during the course of a meeting it becomes apparent for the first time that discipline or potential discipline could arise, the Employer shall stop the meeting and inform the employee of his/her right to representation if he/she so desires...."

**9.** Petitioner asserts that the alleged violation was pointed out by the union representative, Mr. Byrnes, during his testimony before the arbitrator. That does not appear to be the case, however. Mr. Byrnes did not identify the alleged violation in his testimony. Further, the post-hearing *statement of the union in support of petitioner* does not identify the alleged violation either. This explains why the arbitrator did not mention the alleged violation in his opinion.

We also do not think that petitioner raised the issue through a statement in his February 24, 1993 written response to the agency's Notice of Proposed Removal. In that statement, petitioner said that, if he had known or been advised that he was being suspected of tampering, he would have made arrangements so that he could provide another sample. In the statement, however, petitioner did not present his argument that the agency's failure to so advise *was a violation of the Agreement*. In any event, we are not prepared to hold that an argument made in the response to a notice of proposed removal is, without more, deemed raised in a subsequent arbitration proceeding relating to the removal, merely because the response is part of the record before the arbitrator.

**10.** Article 6, Section 1 of the Agreement provides in pertinent part: "When it is known in advance that the subject of a meeting is to discuss or investigate a disciplinary, or potential disciplinary situation, the employee shall be so notified in advance. The employee shall also be notified of his/her right to be accompanied by a Union representative if he/she so desires, and shall be given a reasonable opportunity to obtain such representation before the beginning of the meeting, if requested."

Petitioner also argues that the Agreement requires that any disciplinary action must be set aside if there has been a violation of the employee's union representation rights. In other words, petitioner argues that the agency contracted away the statutory harmful error rule of 5 U.S.C. § 7701(c)(2)(A). Petitioner states that this mandate is in Article 6, Section 2 of the Agreement, which provides that "[n]o disciplinary action may result from any such meeting unless the provisions of this Article have been met." We disagree with petitioner. We interpret Section 2 as providing that evidence (for example, an admission) obtained at a meeting where an employee's union representation rights are violated cannot be used against the employee. In this case, the only relevant evidence relied upon by the agency (other than evidence that was favorable to petitioner) was the adulterated specimen.

Accordingly, petitioner's arguments regarding union representation also do not warrant reversal of the arbitrator's Decision and Award.

## CONCLUSION

Because we conclude that the arbitrator's Decision and Award is supported by substantial evidence, and because petitioner has either waived his union representation claim or failed to establish harm because of a lack of union representation, the Decision and Award is affirmed.

## COSTS

Each side shall bear its own costs.
AFFIRMED.

PAULINE NEWMAN, Circuit Judge, dissenting.

I respectfully dissent, for the agency's failure to follow its own rules for the conduct of random drug tests, including meeting the requirements of the Bargaining Agreement, can not be harmless error when the consequence was loss of Richard Frank's job.

First, the agency's departures from the protocols required for the collection and custody of the urine specimen were per se harmful, for the presumption of adulteration—the sole basis on which Mr. Frank was fired—is founded on the premise that the specimen was properly collected and handled. It was admitted that the rules were not followed; indeed, the arbitrator found that some of the statements made under oath by both of the specimen collectors were false.

Second, Frank's right to union representation was, at best, not conscientiously implemented. Although the arbitrator found that Frank was not prejudiced thereby, he was surely prejudiced by the absence of notice, as required by the Bargaining Agreement, that he was suspected of adulterating the specimen. Frank was given no opportunity to provide another specimen, although the agency ordered another specimen. He was not told that he might be fired if he acted on the manager's permission to go home at the end of his shift; and he was not told that he was at any risk whatsoever due to the apparent low temperature reading. Indeed, the government agrees that had Mr. Frank been permitted to provide a second specimen, separation from service would not have been required if the second specimen was drug-free. In this context, the somewhat casual treatment of the requirements of the representation agreement, together with the several admitted errors in the collection and processing of the specimen, leave no reasonable support for the drastic disciplinary action that was taken.

## TEST PROCEDURES

The urine specimen collection and shipment was consigned to a contractor, Olsten Health Care. Dominick Scalercio and Sandra O'Connor, his supervisor, were both new employees of Olsten, who after two hours of training were sent on December 18, 1992, to the Dutchess County Airport. At about noon Mr. Scalercio and Ms. O'Connor reported to Anthony Capaldi, the acting manager of the airport. Several employees, selected at random, were to be tested that day. The employees were not given advance notice of their selection.

Richard Frank was working a 6:48 a.m. to 2:48 p.m. shift as an air traffic controller. At about 12:30 p.m., as Frank was leaving the men's room, Mr. Capaldi told him of his selection for the random drug test and asked him to provide a urine specimen. Having just left the men's room, Frank was unable

to do so.[1] Capaldi told Frank that he would be called later in the day. Frank returned to work in the airport tower.

At about 2:35 p.m. Capaldi instructed Frank to return to the collection site. Frank was met by Scalercio, who escorted him to the men's room. Scalercio and O'Connor both testified under oath that they placed a bluing agent in the toilet and secured the faucets. (The arbitrator found that this testimony was not credible, thus overcoming the obstacle of lack of access to water in the restroom. As I shall discuss, Frank was fired based on testimony of Scalercio and O'Connor that they followed all requisite procedures in collecting and processing the specimen, although both witnesses contradicted themselves or each other on highly significant points.)

Scalercio remained outside of the men's room while Frank provided the specimen, in accordance with agency procedure regarding privacy. Frank testified that he had not had the opportunity to drink fluids during the intervening two hours he worked in the tower, and that he was able to void only "dribs and drabs" of urine at a time. He was in the men's room for about ten minutes. He emerged at about 2:47 p.m. and gave the specimen to Scalercio, who measured its temperature. This measurement is accomplished by pouring the specimen into a cup with a temperature measuring patch affixed to its side, and must be obtained within four minutes of the time of urination. The agency rule requires that the temperature be within 90.5° and 99.8° F; there is a presumption of adulteration for specimens outside of this range. There appears to have been some difficulty in reading the temperature, which was recorded as 88° F, Frank testifying that it was first read as 92° by him and Scalercio.[2]

Scalercio notified O'Connor that the temperature was low. She testified that she "[came] across the hallway, open[ed] a new urine collection kit, pour[ed] the urine from the one cup into a second cup". The second cup gave no reading, perhaps because the lower limit for the patch was 88° F.

Following these events, O'Connor checked the Olsten procedure manual, and then she and Capaldi went to Capaldi's office where O'Connor called the FAA's Drug Program Coordinator (DPC) for instructions. The DPC requested that a second specimen be obtained from Frank, in accordance with FAA procedure. The DPC asked Capaldi whether he would authorize the necessary overtime for Frank to remain on site in order to provide a second specimen; Capaldi said that he would.

Frank and Scalercio had remained in the conference room with the specimen. Frank then went to Capaldi's office. Scalercio followed Frank. When Scalercio caught up with him, Frank was inside Capaldi's office. Scalercio remained outside of the office. The specimen remained unattended in the conference room. When O'Connor noticed that Scalercio was not with the specimen, she told Scalercio that the specimen was not supposed to leave his sight and instructed him to return to the conference room and secure the specimen. It is significant that Scalercio testified as to the difficulty he encountered in attempting to stay close to Frank because there were "a lot of people in the area," for Scalercio and O'Connor also testified that neither Scalercio nor Frank was away from the specimen for more than a minute.

Scalercio and Frank then returned to the conference room and Frank initialed the seal for the bottle, which he testified was attached to the chain of custody form.[3] In another

---

1. This undisputed explanation of why Frank did not provide the first specimen requires fair weight, for the government's brief leaves the impression that adverse inferences are warranted. Indeed the record shows that three of the five persons selected for testing that day did not provide a specimen at the first request.

2. Robert Fisher—an air traffic controller who was in the collection area for a second attempt to provide a specimen—also testified that Scalercio first read the sample temperature to be 92° F, and that Frank verified this measurement.

3. The panel majority states that the sample was sealed "immediately" after the temperature was taken, a fact on which Scalercio and O'Connor did not agree, and that Frank testified did not happen. Following is an example of Scalercio's testimony under oath, elicited on cross-examination:

   Q  Didn't you testify that Mr. Frank had already left the building when you prepared the samples for shipment to the lab?
   A  We—no. I told you that he gave me the specimen. The temperature was out of range. We tried another cup. There was no temperature on it at all. We transferred to a

procedural violation by those in charge of the tests, Frank was not asked to sign the chain of custody form; and indeed the rules for chain of custody were violated several times by O'Connor and Scalercio. Soon after it appeared that the sample did not meet the temperature requirement Capaldi asked Frank if he wanted to stay on paid overtime to provide another specimen. Frank declined, explaining that his wife worked and that he had to go home to look after his two children, ages five and ten. Capaldi told Frank that he could leave; and he did. Capaldi testified that he expected that Scalercio and O'Connor would return another day for the requested retest.

At this time, O'Connor was on the telephone with the DPC. She told the DPC that Frank was leaving the building and that he had not completed or signed the chain of custody form. O'Connor was instructed to follow Frank and obtain his signature. However, Frank had already left the premises.

Agency procedure also requires that the collector immediately note anything unusual about the donor's behavior or the specimen on the form; a copy of the form is then to be given to the donor. Scalercio made no such notation; for example, he did not record on the form that Frank appeared nervous with his hand shaking when he handed Scalercio the specimen, although Scalercio later so testified. Also, neither Scalercio nor O'Connor recorded at the time that the color was not that of urine or that there was no odor, although O'Connor later testified that the sample was colorless and had no odor. No record appeared on the form that there was no odor of urine. At some time later, O'Connor wrote on the form that Frank's specimen was slightly cloudy and colorless. This notation was absent from Mr. Frank's copy; there is no explanation of when this information—the only recordation that the sample was colorless—was added to the "official" copy, although it was certainly after a copy was given to Frank. Further, the rules require that color be observed immediately and anything unusual recorded: See section II. B.1:

> 1. *Immediately after collection*, the collector shall ... conduct an inspection to *determine the color* and signs of contaminants. Any unusual findings resulting from the inspection shall be noted on the chain of custody form.
>
> . . . .

There was no notation concerning color on the copy of this form that was given to Frank. The laboratory report, issued on about January 14, 1993, was that the specimen was not urine.[4] The sample was not otherwise identified. The additional sample that the DPC had requested was never obtained, or its necessity under FAA rules made known to Frank.

Mr. Frank was telephoned by Dr. Anderson, the FAA's Medical Review Officer, on about January 15, 1993 (the briefs and record are not consistent on the date). During their conversation it became apparent to

---

shipping bottle. I sealed the bottle, signed it, put it in the box, sealed the box.

Q You're testifying now that Mr. Frank was there when this happened?

A I don't believe he was exactly when—

Q Answer yes or no. Was Mr. Frank present when you did this?

A No.

On the same point, O'Connor testified:

Q Was Mr. Frank with you?

A Yes, yes. He must be and he was. And we poured the specimen from the cup into the sealed bottle. We placed a cap over the sealed bottle. Then you put the custody, bottle custody seal on top of it.

O'Connor later made and corrected a contradictory statement, which the majority describes as nothing more than a misstatement.

Frank's testimony matched Scalercio's:

A Well, when I initialed the tag, it was on the form that I believe they peeled it off. Now, I don't remember where the tag came from, to be honest with you.

Q But the tag was not on the bottle?

A No, not that I recall.

I have no way of knowing the truth. However, I do think that O'Connor's testimony, contradicted by Scalercio and Frank, is a slim basis indeed for depriving Mr. Frank of his job.

4. This determination was made by testing the sample's pH, specific gravity, and creatinine concentration. There is an unexplained discrepancy between those results on the lab data sheets and those reported to the agency. The pH of this specimen was recorded as 7.3 on the lab data sheets, but the pH reported to the agency was 6.8. The record offers no explanation of this mystery; but it is one more reason for deeming unreasonable the agency's action in firing Mr. Frank without the authorized second test.

Frank that he was the subject of potential disciplinary action, and he asked that the conversation be terminated until he had the opportunity to speak to either Capaldi or a union representative. Before that telephone call Frank was neither notified that disciplinary action might be taken against him, nor informed by the agency of his right to union representation, as required by Article 6 of the Bargaining Agreement, *see infra.*

On January 25, 1993 Frank was issued a Notice of Proposed Removal on the ground that he had submitted an adulterated specimen. He was duly removed.

## PROCEDURAL VIOLATIONS

### A

The several violations of the DOT rules of collection, custody, and sealing, of themselves require reversal of the disciplinary action against Mr. Frank. I can not agree that these errors were "harmless". U.S. DOT Order 3910.1B and the implementing Drug Testing Guide establish the procedures that are required to be followed by agency personnel in conducting random drug tests. They were violated from the first to the last steps taken by these novice, untrained, and not credible (according to the arbitrator and their own contradictory statements) collectors.

### 1. Collection

In collecting the specimen the Guide requires, *inter alia*, that a bluing agent be placed in the toilet bowl and there must not be any other source of water. Scalercio and O'Connor testified that they placed bluing in the toilet, secured the faucets, and that O'Connor verified this was so prior to each specimen collected. The arbitrator overcame this critical aspect simply by finding the testimony of O'Connor and Scalercio not credible on this point, even as the arbitrator credited all other aspects of their testimony that were adverse to Mr. Frank. I deem not only the procedures, but the arbitrator's treatment of them, seriously flawed.

### 2. Chain of Custody

The chain of custody requirements of the Guide are extensive and detailed, and include in section III.8.a:

(2) While performing the collection part of the chain of custody procedures, *it is essential* that the urine specimen and chain of custody documents be under control of the collector. The collector *shall not leave his/her work station, even momentarily, without securing the specimen and chain of custody form.* The specimen should be packaged for mailing before the collector leaves the site.

(3) The chain of custody form shall be utilized for maintaining *control and accountability from the point of collection to final disposition* of specimens. With each transfer of possession, the chain of custody form shall be dated, signed by the individual releasing the specimen, signed by the individual accepting the specimen, and the purpose for transferring possession noted....

(4) .... *The collector and the individual providing the specimen shall always have the specimen within sight prior to its being sealed and labeled.* The collector shall sign and date across the tape label sealing the container and *ensure that the chain of custody documentation is completed* and attached to each sealed container.

JA–305 (emphases added). None of the emphasized provisions was complied with.

### 3. Temperature Measurement

Guide section II.B.1 includes the following requirements for the measurement of the specimen's temperature:

1. *Immediately* after collection, the collector shall measure the temperature of the specimen (avoiding cross contamination of specimens) and conduct an inspection to determine the color and signs of contaminants. Any unusual findings resulting from the inspection shall be noted on the chain of custody form. *The time from urination to delivery of the sample for temperature measurement is critical and in no case shall exceed 4 minutes.* The individual giving the specimen will be asked to observe the reading of the temperature and the recording of that reading on the control

form. If the temperature of the specimen is outside the range of 32.5–37.7 degrees C/90.5–99.8 degrees F, this gives reason to believe the specimen has been tampered with. After consultation with and approval by the DPC, *another specimen shall be collected under direct observation and both specimens forwarded to the laboratory.* Any specimen suspected to be adulterated should always be forwarded for testing. (See paragraph B.2., "Direct Observation Collection Procedures.")

JA–337 (emphases beyond first added). Neither the requirement for delivery for temperature measurement within four minutes, nor the collection of another specimen, were met.

### 4. Packaging and Sealing

Another relevant provision is:

M. Both *the individual being tested and the collector should keep the specimen in view at all times until it has been packaged and sealed for shipment.* If the specimen is transferred to a second container, the collector shall request the individual to *observe the transfer* of the specimen and the *placement of the tamper-proof seal* over the bottle cap and down the sides of the bottle.

JA–338 (emphases added). Again, the emphasized provisions were not complied with.

### B

The panel majority agrees that there were errors in the chain of custody, but calls them harmless, stating that the bottle containing Frank's specimen was sealed before it was left unattended, and that "there is nothing in the record indicating that the seal was tampered with." As I have discussed, Scalercio testified that the bottle was not sealed until later, and the arbitrator did not find otherwise. O'Connor testified that she instructed Scalercio to return to the specimen and to "seal the bottle." She later testified, correcting herself, that the bottle was already sealed. However, her first statement is consistent with Scalercio's testimony, and Frank's, that Frank was not present when his specimen was transferred from the second cup to the shipping bottle and then sealed.

There was no finding by the arbitrator on the critical question of whether the specimen was sealed before it was left unattended; and the weight of evidence is that it was not. Whether or not Frank really did adulterate his specimen I do not know; but the purpose of these careful procedures is to avoid just the kind of uncertainty and taint that here have arisen. I do not think that the cavalier breach of these elaborate procedures should be tolerated.

Nor can I agree with the majority that the only people present when the specimen was left unattended were "the three collectors, respondent, and possibly one other would-be donor." Scalercio testified that at the time that he left the specimen unattended O'Connor and Capaldi were in Capaldi's office. Scalercio also testified that when Frank went to Capaldi's office, Scalercio's attempts to remain close to Frank were thwarted because there were "a lot of people in the area." The testimony of Scalercio and Frank supports no conclusion other than that the specimen was left in the second cup after the unsuccessful attempt to measure the temperature a second time, and that this cup was left unattended in an area where there were "a lot of people".

Although the arbitrator found that these violations of the required procedures were not prejudicial to Frank because of the absence of evidence that any other person tampered with the specimen, the many breaches of the requisite protocols and procedures require that no prima facie case of adulteration can stand. The fact that the second test was never performed, although requested by the agency, further impeaches the total process whereby a low temperature reading, surrounded by incompetencies, resulted in summary separation from service. I conclude that the presumption of adulteration can not be upheld on this record, and that Frank was unjustly and irregularly denied the opportunity to rebut that presumption by providing a second specimen.

### THE BARGAINING AGREEMENT

Union representation for federal employees is a statutory right, 5 U.S.C. § 7114(a)(2)(B); *National Labor Relations*

*Board v. Weingarten,* 420 U.S. 251, 263, 95 S.Ct. 959, 966–67, 43 L.Ed.2d 171 (1975), which may be modified through collective bargaining. 5 U.S.C. § 7106(b)(2); *see Cornelius v. Nutt,* 472 U.S. 648, 659, 105 S.Ct. 2882, 2889, 86 L.Ed.2d 515 (1985). The Bargaining Agreement included the following provisions:

### ARTICLE 6. REPRESENTATION RIGHTS

**Section 1.** When it is known in advance that the subject of a meeting is to discuss or investigate a disciplinary, or potential disciplinary situation, the employee shall be so notified in advance. The employee shall also be notified of his/her rights to be accompanied by a Union representative if he/she so desires, and shall be given a reasonable opportunity to obtain such representation before the beginning of the meeting, if requested. If during the course of a meeting it becomes apparent for the first time that discipline or potential discipline could arise, the Employer shall stop the meeting and inform the employee of his/her right to representation if he/she so desires, and provide a reasonable opportunity to obtain representation [from the Union] before proceeding with the meeting, if requested. . . .

**Section 2.** No disciplinary action may result from any such meeting unless the provisions of this Article have been met.

Frank argues that since he was not given the requisite notice of a potential disciplinary action, as required by Section 1, then in accordance with Section 2 no disciplinary action could properly ensue. This is a serious charge. It can not be disposed of on the basis that it was not raised before the arbitrator, for indeed, as the arbitrator reported at n. 5 of his opinion, it was raised at least in connection with the telephone call from the MRO. Further, Frank explicitly raised the issue of the absence of notice at the December 18 meeting that he was suspected of tampering, and the absence of notice of potential disciplinary action, in his February 24, 1993 written response to the Notice of Proposed Removal, Frank stating:

Although I was requested to stay overtime so that a direct observation sample could be taken, you never indicated to me that I was being suspected of tampering with my sample. I was unable to stay because of a prior commitment. However, *if I had known or been advised that I was being suspected of tampering,* I would certainly have made other arrangements.

JA–264 (emphasis added).

Our review is of the record before the arbitrator:

In any case filed in the United States Court of Appeals for the Federal Circuit, *the court shall review the record* and hold unlawful and set aside any agency action, findings, or conclusions . . . .

5 U.S.C. § 7703(c) (1988) (emphasis added). *Oshiver v. Office of Personnel Management,* 896 F.2d 540 (Fed.Cir.1990), cited by the majority, holds simply that the appellant can not submit supplemental papers on appeal. Frank's February 24, 1993 letter is of record and was referred to by the arbitrator. Further, the agency is charged with knowledge of the Bargaining Agreement; any lapse in compliance is not a technicality that can be ignored.

Although Capaldi was present when Frank's specimen was declared out of the specified temperature range, raising the presumption of adulteration and the possibility of removal, none of the safeguards of Article 6 was followed in Capaldi's subsequent meetings with Frank. Instead, Capaldi authorized Frank to go home, believing that another test would be made, knowing that the DPC had requested that another test be made. But for the ensuing events, this meeting between Capaldi and Frank may not have violated the Bargaining Agreement. Although in retrospect it is clear that Frank should have been told of possible disciplinary action, it appears that Capaldi in good faith believed that another test would be taken.

The harm to Frank is now apparent, for had he been advised of possible disciplinary action he might have sought immediate union representation, and in turn he might have been advised of the importance of staying on site for a second specimen. Thus it was error for the agency not to have viewed these events as a "potential disciplinary situation", for the error clearly harmed Frank. *See Cornelius v. Nutt,* 472 U.S. at 656 n. 7, 105

S.Ct. at 2888 n. 7 ("the requirement that harmful error have some likelihood of affecting the outcome of the agency's decision"). As the government's counsel stated during argument of this appeal:

> COUNSEL: If [Frank] had given a second sample, both samples would have been tested. And the fact that the first sample still turned out to be water would have given grounds to instigate a removal proceeding. Whether or not the removal went forward after that, maybe it would have and maybe it wouldn't have.

Indeed, maybe Mr. Frank would have been removed anyway. But maybe not, were the second sample drug-free and the first tainted, as it is, by the gaps in the chain of custody and the other procedural lapses.

Frank says that had he had the advice of his union representative, he would have made arrangements for his children and provided a second specimen that afternoon. The provisions of Article 6 reflect the purpose of timely representation for, as the Court stated in *NLRB v. Weingarten*, 420 U.S. at 263–64, 95 S.Ct. at 967, "it becomes increasingly difficult for the employee to vindicate himself [after the employee has been discharged or disciplined], and the value of representation is correspondingly diminished."

### CONCLUSION

The agency's failure to follow its procedures in collecting and processing the sample, the failure to obtain the authorized second sample, and the failure to give notice to Frank that he was at risk, were all error, and not harmless. It is not disputed that the agency's decision might have been affected by a promptly given, drug-free test. As the Court stated in *Cornelius v. Nutt*, 472 U.S. at 655, 105 S.Ct. at 2886–87,

> in an appeal of an agency disciplinary decision to the Board, the agency's failure to follow bargained-for-procedures may result in its action being overturned, but only if the failure might have affected the result of the agency's decision to take the disciplinary action against the individual employee.

When all of these errors are viewed in concert, the agency action is not defensible.

Thus, respectfully, I dissent from the affirmance of the arbitrator's decision.