PROST, Circuit Judge,
dissenting.
I disagree with the majority that Young’s termination amounted to a violation of his due process rights. In my opinion, Young received all the process he was due — and more. The majority views the termination proceedings with blinders, focusing solely on one particular portion of Wadhams’s investigation without considering the extensive pre- and post-termination proceedings that Young received. In doing so, the majority creates an unnecessarily stringent due process standard that bumps up against Supreme Court precedent and opens the door to meritless claims by duly-terminated employees. For these reasons, I respectfully dissent.
I
Young is not a stranger to disciplinary proceedings. The alleged conduct at issue in this case occurred during an earlier arbitration proceeding in which Young was contesting a five-day suspension for allegedly engaging in disruptive behavior when he did not receive a specific desk. J.A. 6. One of HUD’s witnesses at that earlier proceeding was Gregory Darr, who happened to be visiting HUD’s Cleveland Field Office when Young had engaged in the behavior upon which his five-day suspension had been based. While questioning Darr during that proceeding, Young, on the record, asked Darr whether he was a racist. Young later allegedly told Darr during a break in the same proceeding, ‘You are a racist, you are a member of the Ku Klux Klan and you should be shot.”[1] J.A. 17. Based on this latter statement, Shawn Sweet proposed Young’s removal, and Young ultimately was terminated.
II
Under Cleveland Board of Education v. Loudermill, an agency’s pre-termination *1380 proceedings need only afford the employee “oral or written notice of the charges against him, an explanation of the employer’s evidence, and an opportunity to present his side of the story.” 470 U.S. 532, 547, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). These proceedings “need not definitely resolve the propriety of the discharge” but are only “an initial check against mistaken decisions — essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.” Id. at 545-46, 105 S.Ct. 1487. Here, Young received all the process to which he was entitled. The notice of proposed removal informed Young that his removal was based on the statement he 'allegedly made to Darr. It further noted that there was evidence that Darr was visibly shaken by Young’s alleged statement and that Darr had complained to the Field Office Manager. J.A. 17. Young was then given an opportunity to respond to this charge prior to his termination. Ultimately, Young’s termination was based on the precise charge for which he was accorded an opportunity to respond. In my opinion, these pre-termination proceedings undoubtedly provided enough process to allow Wadhams, the deciding official, to determine whether there were reasonable grounds to believe that Young made the alleged statements and whether termination was the appropriate penalty.
The majority, however, concludes that these pre-termination proceedings were insufficient because Young did not have an opportunity to respond to the evidence uncovered during Wadhams’s ex parte pretermination investigation. As we have previously recognized, however, “not every ex parte communication is a procedural defect so substantial and likely to cause prejudice that it undermines ... due process.” Ward v. U.S. Postal Serv., 634 F.3d 1274, 1279 (Fed.Cir.2011) (quoting Stone v. FDIC, 179 F.3d 1368, 1376-77 (Fed.Cir. 1999)). Instead, “the ultimate inquiry is whether the ex parte communication is ‘so substantial and so likely to cause prejudice that no employee can fairly be required to be subjected to a deprivation of property under such circumstances.’ ” Id. (quoting Blank v. Dep’t of the Army, 247 F.3d 1225, 1229 (Fed.Cir.2001)).
Here, I cannot accept that the identified ex parte communications created such prejudice to Young that his due process rights were violated. Young argues that these ex parte communications — particularly Wadhams’s communications related to Davis’s alibi for Young — led Wadhams to discount Davis’s affidavit, an affidavit which Young himself had submitted to support his response to the proposed notice of removal. See Young Br. 22 (“In particular, Ms. Wadhams discounted Mr. Davis’ affidavit upon information she obtained ex parte from Mr. Davis and other HUD employees she interviewed, and this information was pivotal to her decision to sustain the charge against Mr. Young.”). The ex parte communications, therefore, did not result in new and material information to support the charge against Young, but merely followed up on Young’s own evidence. That is, Young was informed of the specific charge against him, had an opportunity to respond to the charge, and was ultimately removed based solely on that charge. Nevertheless, Young is arguing that he had a right to know — before his termination — whether the deciding official would credit his evidence. This is not the law."
Furthermore, to the extent that Young is arguing that Wadhams’s additional communications with HUD employees violated his due process rights, those communications simply confirmed what was already noted in the proposed notice of removal: Darr was visibly shaken after the alleged encounter with Young. J.A. 17. Where, *1381 as here, the deciding official interviews other agency employees “merely to confirm and clarify information that was already in the record ... there is no due process violation.” Blank, 247 F.3d at 1229. Consequently, on this record, I am unwilling to conclude that Wadhams’s ex parte communications were “so substantial and so likely to cause prejudice” that they amounted to a due process violation.
Even assuming Wadhams’s ex parte investigation did taint the pre-termination proceedings, the post-termination hearings before the arbitrator decidedly cured any procedural due process deficiencies. Our sister circuits, applying Loudermill, have recognized that “extensive post-termination proceedings may cure inadequate pre-termination proceedings.” Krentz v. Robertson Fire Prot. Dist., 228 F.3d 897, 902 (8th Cir.2000); Schacht v. Wisconsin Dep’t of Corrections, 175 F.3d 497, 503 (7th Cir.1999) (“[Plaintiffs] procedural due process claim fails ... because, even if he could prove his claim, he had adequate post-termination administrative remedies he could have pursued.”). In this case, the arbitrator held a four-day hearing during which Davis testified and Young had an opportunity both to present his side of the story and to cross-examine HUD’s witnesses. The arbitrator was not persuaded by Young’s version of the events and instead credited Darr’s testimony. We owe the arbitrator’s determinations the same deference that we apply to decisions from the Board. See 5 U.S.C. § 7121(f); Frank v. Dep’t of Transp., 35 F.3d 1554, 1556 (Fed.Cir.1994).
Ill
I also disagree with the majority’s determination that Wadhams’s conduct violated agency policy and somehow “resulted in a harmful procedural error requiring reversal.” Maj. Op. at 1378. As an initial matter, it is unclear whether HUD’s Adverse Actions Handbook is actually binding on the agency. See Farrell v. Dep’t of the Interior, 314 F.3d 584, 590 (Fed.Cir.2002) (“The general consensus is that an agency statement, not issued as a formal regulation, binds the agency only if the agency intended the statement to be binding.” (citations omitted)). But even if it were, Wadhams’s ultimate decision was not “based on” her ex parte communications. Nor did Wadhams rely on these communications to glean additional reasons for terminating Young in violation of 5 CFR § 752.404(g)(1). Rather, the communications here were merely an attempt to confirm and clarify information — submitted by Young — that was already contained in the record. In my view, such communications do not amount to procedural error, let alone harmful procedural error.
Finally, neither the arbitrator nor Wad-hams improperly relied upon Young’s prior misconduct. While the arbitrator did mention it, there is no indication that this recognition played any role in his conclusion that the agency proved the charge at issue here. Indeed, before discussing Young’s past behavior pattern, the arbitrator had already concluded that “[t]here is no doubt in this writer’s mind that the grievant was responsible for the commentary to Darr at the time and place complained of.” J.A. 11. Similarly, Wad-hams’s decision letter expressly recognized “that the sustained charge, standing alone, regardless of [the] first or second offense, is sufficient to justify [Young’s] removal.” J.A. 23.
IV
In sum, let us be clear: Wadhams did not rely upon her ex parte communications to bring additional charges against Young, or even to provide additional proof that Young committed the misconduct specifically charged here. Rather, she relied *1382 upon these communications merely to confirm and clarify information that was already contained in the record. That is not a violation of due process. We should defer to the arbitrator’s assessment of Young and his claim and affirm, I respectfully dissent.

. Indeed, in response to Young's alleged statement during the break, his coworkers "expressed elevated concern in the possibility that Mr. Young's unpredictable behavior will become violent.” J.A. 13. In fact, one coworker stated that “people here are scared, and their feelings are becoming more intensified because of the behavior of Mr. Young. They are afraid of him.... This is no way to work. No one should come into work fearful of what might happen if Mr. Young shows up and gets angry.” J.A. 14.