**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**2016 MSPB 1**

Docket No. SF-0752-14-0761-I-1

**Jeremy Forte,**

**Appellant,**

**v.**

**Department of the Navy,**

**Agency.**

January 6, 2016

Brian A. Selvan, Esquire, Aliso Viejo, California, for the appellant.

Richard D. Ruppe, Esquire, San Diego, California, for the agency.

**BEFORE**

Susan Tsui Grundmann, Chairman
Mark A. Robbins, Member

**OPINION AND ORDER**

¶1      The agency has filed a petition for review and the appellant has filed a cross petition for review of the initial decision, which reversed his 30-day suspension for illegal drug use and denied both his affirmative defense of disability discrimination based on disparate treatment and his motion for sanctions. For the reasons set forth below, we DENY the petition for review and the cross petition for review and AFFIRM the initial decision as MODIFIED by this Opinion and Order to analyze the appellant's harmful procedural error claim and to apply a mixed-motive analysis to his disability discrimination claim.

BACKGROUND

¶2 The appellant is a Firefighter at the agency's Point Loma Naval Base in San Diego, California. Initial Appeal File (IAF), Tab 4 at 14. His position is a testing designated position and thus he is subject to drug testing on a random basis. *Id.* at 105. On May 8, 2014, the appellant was selected for a random drug test. *Id.* at 39. On May 16, 2014, J.C., a Medical Review Officer for the agency, notified the appellant that his urine sample had tested positive for cocaine. Hearing Transcript (HT) at 111-12. The appellant requested a retest, which also reported positive for cocaine. IAF, Tab 4 at 36, 41; *see* IAF, Tab 18 at 98-99.

¶3 On June 11, 2014, the agency proposed the appellant's removal for illegal drug use based on the test results. IAF, Tab 4 at 32-34. The appellant responded to the proposed removal orally and in writing. *Id.* at 15, 19-26. With his written response, the appellant provided the results of a hair follicle drug test that he privately obtained on June 9, 2014, which indicated that he had tested negative for cocaine. *Id.* at 24. The deciding official sustained the charge but mitigated the penalty to a 30-day suspension, which was effective on July 28, 2014. *Id.* at 15-18.

¶4 The appellant filed a Board appeal of the suspension and requested a hearing. IAF, Tab 1. He asserted that he had never used cocaine and alleged that there were "irregularities" in the collection of his urine specimen. IAF, Tab 21 at 5. In particular, he alleged that the individual who collected his urine specimen forgot to have him initial the two vials containing his specimen before he left the testing restroom and had to call him back to the restroom to initial the vials. *Id.* The appellant also raised a claim of disability discrimination based on disparate treatment.[1] IAF, Tab 1 at 6.

---

[1] As to his disability, the appellant noted that, due to a congenital abnormality, he has partially missing digits on both hands. IAF, Tab 1 at 6.

¶5       During discovery, the parties became involved in a dispute regarding the appellant's request that the agency make a sample of the urine specimen at issue available for deoxyribonucleic acid (DNA) testing so that he could determine whether the specimen was his. IAF, Tabs 13-14. The administrative judge granted the appellant's motion to compel production of the sample. IAF, Tab 15. The administrative judge issued a subpoena duces tecum directing the Forensic Toxicology Drug Testing Laboratory (FTDTL) of the Department of the Army (Army) in Fort Meade, Maryland, which has physical custody of the urine specimen, to produce a sample of the specimen. IAF, Tab 32. The Army filed a motion to quash the subpoena, asserting that the regulations of the Substance Abuse and Mental Health Services Administration (SAMHSA) of the Department of Health and Human Services (HHS) concerning drug testing—the Mandatory Guidelines for Federal Workplace Drug Testing Programs (HHS Guidelines)—prohibit DNA testing on urine specimens collected for Federal agency workplace drug testing programs. IAF, Tab 38; *see* 73 Fed. Reg. 71858, 71861 (Nov. 25, 2008). The appellant filed a motion for sanctions against the agency based on its failure to provide him with a sample of the specimen. IAF, Tab 35. In his motion, the appellant requested that the agency be precluded from presenting evidence of the positive drug test that was the basis for his suspension and that the administrative judge draw an adverse inference that the urine sample that tested positive for cocaine did not originate from him. *Id.* at 8.

¶6       Following a hearing, the administrative judge issued an initial decision reversing the appellant's suspension, finding that the agency did not prove the charge by preponderant evidence. IAF, Tab 40, Initial Decision (ID) at 8-9. The administrative judge also found that the appellant failed to prove disability discrimination. ID at 9-12. The administrative judge granted the Army's motion to quash the subpoena duces tecum ordering it to produce the urine sample, finding that the issue of DNA testing was moot due to her reversal of the adverse action. ID at 8 n.2. She denied the appellant's motion for sanctions on the

grounds that "the agency made every effort to obtain the urine sample and that the non-production was a result of third-party actions over which the agency had no control." *Id.*

¶7 The agency has filed a petition for review.[2] Petition for Review (PFR) File, Tab 1. The appellant has filed a response to the petition for review and a cross petition for review, reasserting his disability discrimination claim and alleging that the administrative judge erred in denying his motion for sanctions. PFR File, Tabs 3-4. The agency has filed a response to the appellant's cross petition for review and a reply to the appellant's response to the petition for review. PFR File, Tabs 6-7. The appellant has filed a reply to the agency's response to his cross petition for review. PFR File, Tab 8.

## ANALYSIS

¶8 When an agency relies on a positive drug test to take an adverse action against an employee, the agency must prove by preponderant evidence that the test was valid. *See Boykin v. U.S. Postal Service*, 51 M.S.P.R. 56, 58 (1991); 5 C.F.R. § 1201.56(b)(1)(ii). To meet its burden, the agency must establish that the urine sample that tested positive was the appellant's by showing that the chain of custody of the sample was maintained and verifiable. *See Storm v. Department of the Army*, 64 M.S.P.R. 14, 21 (1994); *Boykin*, 51 M.S.P.R. at 58 (finding that a charge based on the appellant's positive drug test could not be sustained because the agency did not present testimony of a witness with knowledge of the chain of custody of the appellant's urine sample and thus failed to show that the urine sample was the appellant's).

---

[2] With its petition for review, the agency submits documents pertaining to the appellant's hair follicle test. PFR File, Tab 1 at 29-33. Because these documents are already part of the record, IAF, Tab 18 at 93-97, they do not constitute new evidence. *See Meier v. Department of the Interior*, 3 M.S.P.R. 247, 256 (1980).

¶9     A violation of the agency's drug-testing procedures does not "automatically and fatally" undermine the chain of custody, however. *Frank v. Department of Transportation*, 35 F.3d 1554, 1557 (Fed. Cir. 1994) (declining to apply a per se rule requiring that adverse actions based on drug tests be set aside because of an agency's failure to follow its drug-testing procedures). Rather, the Board and our reviewing court have held that the harmful error standard is appropriate in reviewing a claim that an agency has violated procedures in administering a drug test. *Id.* at 1557-58 (finding that the agency's violation of its chain-of-custody procedures by leaving a specimen unattended did not harm or prejudice the employee because there was no evidence that any other person had access to the specimen during the short time it was left unattended); *Storm*, 64 M.S.P.R. at 22-24; *Vincent v. Department of Transportation*, 47 M.S.P.R. 550, 555 (1991). Reversal of an action for harmful error is warranted where the procedural error likely had a harmful effect upon the outcome of the case before the agency. *Henton v. U.S. Postal Service*, 102 M.S.P.R. 572, ¶ 15 (2006). To show harmful error, an appellant must prove that any procedural error was likely to have caused the agency to reach a conclusion different from the one it would have reached in the absence or cure of the error. *Id.*

¶10    Even though the appellant alleged that there were irregularities in the urine drug test, IAF, Tab 21 at 5, and that the "drug testing facility violated chain of custody procedures when it collected the sample at issue," IAF, Tab 1 at 6, the administrative judge found that the appellant was not raising a harmful error claim as to the procedures regarding the random drug test, ID at 7 n.1. The administrative judge stated that she would "review the facts related to the collection of the urine specimen for purposes of weighing the evidence as to the validity of the urine specimen test." *Id.* Accordingly, the administrative judge did not apply a harmful error standard in analyzing the appellant's allegations about errors involving the administration of the drug test. *Id.*

¶11    In support of her determination that the agency failed to prove its charge by preponderant evidence, the administrative judge found that:  the evidence of record establishes that an error in the collection of the urine specimen may have occurred, ID at 9; and the hair follicle test result is scientifically valid evidence that the appellant did not use cocaine during the time period included by the urine test, ID at 7.  In addition, the administrative judge noted as follows:  the appellant consistently has stated that he has never used cocaine and that there must have been an error in either the collection or chain of custody of the urine sample, *id.*; and during the course of litigation, the appellant requested a sample of the urine specimen so that it could be tested for DNA to verify whether the urine was actually his, but a sample was not produced, ID at 8.

<u>The administrative judge properly found that there may have been an error in the collection of the appellant's urine specimen.</u>

¶12    On petition for review, the agency challenges the administrative judge's finding that the evidence of record establishes that an error in the collection of the appellant's urine specimen may have occurred.  PFR File, Tab 1 at 16-21.  At the hearing, the appellant and the individual who collected his urine specimen provided conflicting accounts of the collection process.  The appellant testified that, as he was walking away from the testing restroom after providing his urine sample, the specimen collector called him back to the restroom and informed him that she had forgotten to have him initial the two vials containing his specimen. HT at 304-05.  The appellant testified that when he returned to the restroom, the collector opened the bag with the vials containing his specimen, thereby breaking the seal on the bag, and he initialed the vials.  HT at 305-06.  He testified that the collector then took a new bag from the restroom counter, placed the vials in that bag and sealed it, and he initialed the new bag.  HT at 305-06, 360-61.  The appellant further testified that about 10 minutes later, the agency's regional

drug-free workplace coordinator asked him to initial another form[3] that she had forgotten to have him sign. HT at 306, 362; *see* HT at 7-8.

¶13   By contrast, the specimen collector testified that the appellant initialed the vials containing his urine specimen before leaving the testing restroom. HT at 84, 86. She acknowledged that she called back the appellant after he had left the restroom, but stated that she did so to have him initial the Specimen Collection Checklist, not the vials. HT at 84. She further testified that she did not open another bag and that doing so would have required her to go to another room, as the testing restroom did not contain any extra drug-testing kits, which include the bag in which the vials containing the specimen are placed. *Id.*; *see* HT at 16-17.

¶14   Although the administrative judge did not make any explicit credibility findings in the initial decision, she evidently credited the hearing testimony of the appellant over that of the specimen collector. The administrative judge rejected the agency's argument that the appellant's contention, that there was an irregularity in the urine collection process, is not credible because he signed the chain-of-custody form and did not raise the issue at the time of collection. ID at 7. The administrative judge found that "the appellant's failure to raise the issue at the time is understandable because he did not suspect that there was any problem at the time and underscores his consistent statement and actions that he has never used cocaine." *Id.* In addition, the administrative judge discounted the collector's testimony that there was no irregularity in the collection of the appellant's urine specimen, finding that, "while the collector may not recall there

---

[3] In his testimony, the appellant indicated that the form that he was asked to sign is the Specimen Collection Checklist. HT at 362; *see* IAF, Tab 18 at 100.

being a problem, given the number of specimens she handled that particular day, she may genuinely have no memory of the issue."[4]  ID at 9.

¶15    The agency challenges the administrative judge's implied credibility finding on review, arguing that her "implicit belief of the appellant's version of events over that of the collector[] failed to consider the implausibility of the appellant's story, and is therefore erroneous."  PFR File, Tab 1 at 20 (citing *Hillen v. Department of the Army*, 35 M.S.P.R. 453, 458, 461 (1987) (stating that one of the factors that an administrative judge must consider in resolving credibility issues is the inherent improbability of the witness's version of events)).  In support of this argument, the agency describes the protocol for collecting a urine sample, noting that a collector must restrict access to collection supplies before and during the collection and that the testing restroom does not contain extra drug-testing kits.  PFR File, Tab 1 at 17-20.  The agency asserts that it is unreasonable for the administrative judge to conclude that an experienced collector would have deviated so far from required collection protocol as to stock the testing restroom with extra drug-testing kits.  *Id.* at 21.  The agency also contends that the appellant's version of events leaves significant questions unanswered, such as "where did the collector get a new bag?"  *Id.* at 20.

¶16    We find the agency's arguments unavailing.  As noted above, the appellant testified that there were bags on the counter of the testing restroom.  HT at 360-61.  Thus, contrary to the agency's argument on review, the appellant's testimony does not leave unanswered the question of where the collector obtained a new bag.  Moreover, the Board must give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing, and may overturn such determinations only when it has "sufficiently sound" reasons for

---

[4] The specimen collector testified that she collected 45 to 55 specimens on May 8, 2014. HT at 87.

doing so. *Haebe v. Department of Justice*, 288 F.3d 1288, 1301 (Fed. Cir. 2002). The agency's argument that the administrative judge erred in crediting the appellant's testimony as to what occurred during the collection process is, in essence, mere disagreement with the administrative judge's implied credibility findings and, as such, provides no basis for disturbing the initial decision. *See Broughton v. Department of Health & Human Services*, 33 M.S.P.R. 357, 359 (1987) (finding no reason to disturb the administrative judge's findings where she considered the evidence as a whole, drew appropriate inferences, and made reasoned conclusions).

The appellant did not show that the alleged error during the collection of his urine specimen is a harmful procedural error.

¶17      The agency also argues on review that the administrative judge erred by failing to analyze the appellant's allegation that an error occurred during the collection of his urine specimen under a harmful error standard, and it asserts that the appellant did not satisfy that standard. PFR File, Tab 1 at 21-22. Therefore, the agency contends, even assuming that an error in the collection of the urine specimen occurred, it does not negate the validity of the urine test and thus provides no basis for reversing the agency's action. *Id.*

¶18      As noted above, both the Board and our reviewing court have held that the harmful error standard is appropriate in reviewing an appellant's claim that an agency has violated procedures in administering a drug test. *Frank*, 35 F.3d at 1557-58; *Storm*, 64 M.S.P.R. at 22-24 (finding that the agency's failure to notify the appellant of his test results within 5 days of the test, as required by the HHS Guidelines, did not constitute harmful procedural error, and thus provided no basis for disturbing the agency's decision to remove the appellant, because he did not prove that the delay in reporting his test results likely caused the agency to reach a conclusion different from the one it would have reached in the absence or cure of the error). In this case, the appellant claimed there was an irregularity in the collection of his urine sample in that the specimen collector failed to have

him initial the vials containing his specimen before he left the testing restroom. IAF, Tab 1 at 6, Tab 4 at 21, Tab 21 at 5. Given that both the Board and our reviewing court have analyzed such allegations as harmful error claims, we agree with the agency that the administrative judge should have considered whether the alleged error in the collection process was a harmful procedural error.

¶19     We also agree with the agency that the appellant did not prove that the specimen collector's alleged failure to have him initial the vials containing his urine specimen before he left the testing restroom constituted harmful error. As noted above, to establish harmful error, an appellant must prove that a procedural error was likely to have caused the agency to reach a conclusion different from the one it would have reached in the absence or cure of the error. 5 C.F.R. §§ 1201.4(r), 1201.56(c)(1); *see Stephen v. Department of the Air Force*, 47 M.S.P.R. 672, 681, 685 (1991); *Vincent*, 47 M.S.P.R. at 556. The agency suspended the appellant based on the positive results of the urine test and there is no evidence that those results would have been different if the specimen collector had directed the appellant to initial the sealed vials containing his specimen before he left the restroom, as required by HHS Guidelines, instead of calling him back to the restroom to do so after she had placed the vials in a bag and sealed the bag. *See* 73 Fed. Reg. at 71885, Section 8.7 of the HHS Guidelines (providing that the specimen donor must initial the tamper-evident seals on each specimen bottle before the collector seals the bottles in a package for transfer to a testing laboratory); *see also* IAF, Tab 18 at 149, 171-72, HHS SAMHSA Urine Specimen Collection Handbook (describing the specimen collection process). Thus, the appellant has not shown that, in the absence of the alleged collection error, the agency likely would have reached a conclusion different from the one it reached. Accordingly, we modify the initial decision to find that the alleged collection error was not harmful. Therefore, the alleged collection error, standing alone, does not require reversal of the appellant's suspension.

¶20    Significantly, however, the administrative judge did not conclude that the agency failed to prove its charge by preponderant evidence solely because an error in the collection of the appellant's urine specimen may have occurred. Rather, the administrative judge determined that the agency failed to prove its charge based on her consideration of the record in its entirety, and the possibility that an error occurred during the collection process was just one factor that the administrative judge cited in support of that determination. *See* ID at 7-9. Consequently, the appellant's failure to show that the alleged error by the specimen collector was harmful (i.e., led to the positive test result) by itself does not warrant disturbing the administrative judge's finding that the agency failed to prove its charge.

The administrative judge properly considered the result of the hair follicle test in finding that the agency failed to prove its charge.

¶21    As noted above, another factor that the administrative judge cited in support of her finding that the agency failed to meet its burden of proving its charge is the negative result of the hair follicle test. ID at 7, 9. In the initial decision, the administrative judge noted that the Executive Order that authorizes the testing of Federal employees for illegal drug use provides that "[p]ositive drug test results may be rebutted by other evidence that an employee has not used illegal drugs." ID at 7 (citing Exec. Order No. 12,564, 51 Fed. Reg. 32889, 32891 (Sept. 15, 1986)). Based upon the relevant documentary evidence and hearing testimony, including the testimony of J.C. that hair follicle drug tests generally are accepted in the scientific community and that it would be unusual for a urine test to show a positive result for cocaine and a hair follicle test covering the same time period to report a negative result for cocaine use, HT at 119-20, the administrative judge found that the hair follicle test result is scientifically valid evidence that the appellant did not use cocaine during the time period included by the urine test. ID at 7.

¶22    The agency challenges this finding on review, arguing that the hair follicle test result is not scientifically valid because the appellant did not establish that the chain of custody of the hair follicle was properly maintained or that the laboratory testing procedures were accurate. PFR File, Tab 1 at 7-8. More specifically, the agency argues that the appellant failed to show that the chain of custody for the hair follicle sample was properly maintained for two reasons: (1) the chain-of-custody form documenting the collection of the appellant's hair follicle sample was not signed and dated by the testing laboratory; and (2) the appellant did not produce any evidence showing that the chain of custody of the hair follicle specimen was maintained while the specimen was at the testing laboratory. *Id.* at 11-13. As for the accuracy of the laboratory testing procedures, the agency asserts that the appellant did not produce any evidence regarding the tests conducted, the procedures followed, or the protocols observed by the testing laboratory during the testing of the appellant's hair follicle specimen. *Id.* at 15. Therefore, the agency contends, the administrative judge erred in relying on the hair follicle test result in finding that the agency failed to prove the charge. *Id.* at 16.

¶23    We agree with the agency that the documentation regarding the hair follicle test is much less extensive than the documentation regarding the urine test. The record includes a 56-page litigation support package from the Fort Meade FTDTL, which documents the chain of custody for the urine specimen at the laboratory and the laboratory test results. IAF, Tab 18 at 29-84. The record does not contain the same information regarding the hair follicle test because the appellant did not order a litigation package from the laboratory that conducted that test. *See* HT at 150-51 (testimony of the vice-president of the company that collected the appellant's hair follicle specimen).

¶24    We disagree, however, with the agency's apparent assertion that the absence of such information renders the hair follicle test result scientifically invalid and thus not entitled to any consideration in determining whether the

agency proved the charge. Rather, we find that, although the lack of detailed information regarding the hair follicle drug test detracts from the weight that otherwise would be afforded the negative result of that test, the result of the hair follicle test nonetheless is entitled to consideration as evidence showing that the appellant did not use cocaine during the period covered by the urine drug test. Accordingly, we find that the administrative judge properly considered the result of the hair follicle test in determining whether the agency proved its charge.

The unavailability of the specimen for DNA testing due to the Army's refusal to release a sample of the urine specimen supports the administrative judge's finding that the agency failed to prove its charge.

¶25    Another factor that the administrative judge cited in support of her finding that the agency failed to prove its charge is the appellant's unsuccessful effort to obtain a sample of his urine specimen for DNA testing so that he could prove that the urine specimen at issue actually did not belong to him. ID at 8. The appellant consistently has maintained that he has never used drugs and that the positive urine specimen did not belong to him. *See, e.g*., IAF, Tab 24 at 179. Thus, a key issue in this case is whether the urine specimen that tested positive for cocaine originated from the appellant. As previously noted, the appellant attempted to secure the specimen for DNA testing to rebut the agency's charge of illegal drug use by showing that the specimen at issue did not belong to him; however, he was unable to do so because the Army refused to release the sample based on its determination that the HHS Guidelines prohibit the use of urine specimens for any DNA testing, including, apparently, testing requested by the individual who provided the sample. *See* IAF, Tabs 13, 15, 38. The Army's refusal to produce the sample deprived the appellant of evidence that was critical to his efforts to rebut the validity of the positive test results by effectively denying him the opportunity to establish that the urine specimen did not belong to him. In light of these circumstances, we find that the urine drug test results are entitled to less weight than would be the case if the urine sample had been made

available to the appellant for DNA testing. *Cf. Banks v. Federal Aviation Administration*, [687 F.2d 92](#), 96 (5th Cir. 1982) (determining that a testing laboratory's disposal of urine samples required suppression of positive results of its tests in the appellants' removal appeals because the samples were not made available to the appellants for their independent testing and inspection). Therefore, we find the appellant's inability to establish that the urine sample that tested positive did not belong to him due to the Army's refusal to release the urine specimen supports the administrative judge's finding that the agency failed to prove its charge.

The Board need not address the appellant's request for sanctions.

¶26    In his cross petition for review, the appellant argues that the administrative judge erred in declining to impose sanctions against the agency for violating her order to produce a sample of the urine specimen that tested positive for cocaine so that the appellant could have the sample tested for DNA to determine whether it belonged to him.[5]    PFR File, Tab 3 at 4-5.    The appellant requests that the Board review the administrative judge's ruling denying sanctions in the event that it agrees to review the administrative judge's initial decision finding that the agency failed to prove the charge. *Id.* at 6.    In light of our decision to deny the agency's petition for review and affirm the administrative judge's finding that the

---

[5] In his cross petition for review, the appellant incorrectly states that the administrative judge declined to award sanctions because she found that the issue of DNA testing was moot due to her finding that the agency failed to prove the charge by preponderant evidence.  PFR File, Tab 3 at 6, 11-12.  While the administrative judge granted the Army's motion to quash the subpoena duces tecum directing it to release a sample of the urine specimen for DNA testing based on her finding that the issue of DNA testing was moot as a result of her finding that the agency failed to prove its charge, she did not deny the appellant's motion for sanctions on that basis.  Rather, she denied the motion for sanctions based on her finding that the agency made every effort to obtain the urine sample and that the nonproduction was the result of third-party actions over which the agency had no control.  ID at 8 n.2.

agency failed to prove the charge, we need not address the administrative judge's ruling denying the appellant's motion for sanctions.

<u>The appellant failed to prove that the agency discriminated against him based on disability.</u>

¶27 On cross petition for review, the appellant also alleges that the administrative judge erred in finding that he failed to prove his affirmative defense of disability discrimination based on disparate treatment. PFR File, Tab 3 at 4-10. In analyzing this affirmative defense, the administrative judge applied the standard set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), and found that the appellant did not meet his burden of proving disparate treatment because he did not provide any evidence establishing that the agency's action was pretextual and was actually the result of discriminatory intent. ID at 9-12. However, in *Southerland v. Department of Defense*, 119 M.S.P.R. 566, ¶¶ 18–22 (2013), the Board found that a mixed-motive analysis applies to claims of disparate treatment based on disability. Under a mixed-motive analysis, an employee is entitled to some relief if he proves that his disability was "a motivating factor" in the decision, "even though other factors also motivated the practice." *Id*., ¶ 23 (citing 42 U.S.C. §§ 2000e-2(m), 2000e-5(g)(1)). An agency may limit the extent of the remedy if it demonstrates that it "would have taken the same action in the absence of the impermissible motivating factor." *Id*., ¶¶ 23-25 (citing 42 U.S.C. § 2000e-5(g)(2)(B)). Because the record is fully developed on the appellant's affirmative defense, the Board can apply the mixed-motive analysis without remand.

¶28 The appellant argues on review that the evidence established that the proposing official and C.S., a human resources specialist who advised the proposing and deciding officials about possible discipline for the appellant, had an "improper animus" against him that was "motivated by discrimination due to [his] disability." PFR File, Tab 3 at 9. In support of this contention, the

appellant asserts that during the hearing, the proposing official and C.S. contradicted their deposition testimony that they based their recommendations regarding his discipline on the results of the urine drug test and did not consider any of the factors identified in the notice of proposed removal.[6] *Id.* at 7-8.

¶29    The appellant also cites as evidence of disability discrimination various statements made by the proposing official and C.S., which the appellant claims were incriminating.  PFR File, Tab 3 at 9.  In particular, the appellant alleges that the proposing official made an incriminating statement by asserting in emails that he believed that the results of the retest of the appellant's urine sample would be positive and that he had a "high suspicion of drug use" by the appellant.  *Id.*; *see* IAF, Tab 24 at 85.  As for C.S., the appellant cites as evidence of disability discrimination the following excerpt from an email that she sent to the proposing official informing him that the appellant's wife had contacted her to inquire about his status:  "[h]is wife just called me again . . . WTF . . . Why you harassing him LMAO!!!!"[7]  PFR File, Tab 3 at 9; *see* IAF, Tab 24 at 91.

¶30    Based on our review of the record, we find that the evidence cited by the appellant does not indicate that the appellant's disability was a motivating factor in the agency's decision to suspend him.  Contrary to the appellant's assertion on review, the inconsistencies between the hearing testimony and the deposition testimony of the proposing official and C.S. regarding whether they considered any mitigating factors in recommending disciplinary action against the appellant

[6] In the proposed removal letter, the proposing official stated that he considered the relevant aggravating and mitigating factors in proposing the appellant's removal.  IAF, Tab 4 at 33.  More specifically, he stated that he considered as aggravating factors the seriousness of the appellant's misconduct and that the appellant was on notice of the requirements of his position.  *Id.*  The proposing official stated that he considered as mitigating factors the appellant's years of Federal service and found that he had the potential for rehabilitation.  *Id.*

[7] The acronym "WTF" is short for "what the [expletive]?," and "LMAO" stands for "laugh my [expletive] off."

do not indicate that these individuals had animus towards him based on his disability.

¶31     We also disagree with the appellant's assertion, cited in his cross petition for review, that the statements of the proposing official and C.S. reflect discriminatory animus. The proposing official's statements indicate that he believed the appellant was using drugs, but do not reflect any animus towards the appellant based on his disability. Thus, even assuming that the proposing official's statements reflect an intent on his part to "get rid of" the appellant, as the appellant asserts on review, PFR File, Tab 3 at 9, there is no indication that he wanted to remove the appellant for any reason other than his belief that the appellant was using illegal drugs. C.S.'s statements, while inappropriate and insensitive, also do not indicate that she had any animus toward the appellant based on his disability.

¶32     During the proceedings below, the appellant also cited as evidence of disability discrimination derogatory statements by his coworkers regarding his disability and a statement by the agency physician who conducted his preemployment physical that she could not recommend him for the position because of his disability. IAF, Tab 21 at 5; HT at 288-95. As the administrative judge noted in the initial decision, the appellant admitted that he never raised any of the incidents to either the proposing or deciding official. ID at 11; *see* HT at 295-96. Moreover, there is no evidence indicating that either of those officials shared the views reflected in the statements cited by the appellant. In light of these circumstances, we find that the statements of the appellant's coworkers and the agency physician do not show that the appellant's disability was a motivating factor in his suspension.

¶33     Because the record evidence does not show that the appellant's disability was a motivating factor in the agency's decision to suspend him, we agree with

the administrative judge that the appellant failed to establish his affirmative defense of disparate treatment based on his disability.[8]  In sum, we find that the agency has failed to prove its charged misconduct of illegal drug use and that the appellant has failed to prove his affirmative defense of disability discrimination.

## ORDER

¶34     We ORDER the agency to cancel the appellant's 30-day suspension and to restore the appellant effective July 28, 2014.  *See Kerr v. National Endowment for the Arts*, 726 F.2d 730 (Fed. Cir. 1984).  The agency must complete this action no later than 20 days after the date of this decision.

¶35     We also ORDER the agency to pay the appellant the correct amount of back pay, interest on back pay, and other benefits under the Office of Personnel Management's regulations, no later than 60 calendar days after the date of this decision.  We ORDER the appellant to cooperate in good faith in the agency's efforts to calculate the amount of back pay, interest, and benefits due, and to provide all necessary information the agency requests to help it carry out the Board's Order.  If there is a dispute about the amount of back pay, interest due, and/or other benefits, we ORDER the agency to pay the appellant the undisputed amount no later than 60 calendar days after the date of this decision.

¶36     We further ORDER the agency to tell the appellant promptly in writing when it believes it has fully carried out the Board's Order and to describe the actions it took to carry out the Board's Order.  The appellant, if not notified, should ask the agency about its progress.  *See* 5 C.F.R. § 1201.181(b).

---

[8] To the extent that the administrative judge applied an incorrect analysis to the appellant's discrimination claim, we have applied the correct analysis and find that any error did not prejudice the appellant's substantive rights.  *See Panter v. Department of the Air Force*, 22 M.S.P.R. 281, 282 (1984) (stating that an adjudicatory error that is not prejudicial to a party's substantive rights provides no basis for reversal of an initial decision).

¶37     No later than 30 days after the agency tells the appellant that it has fully carried out the Board's Order, the appellant may file a petition for enforcement with the office that issued the initial decision in this appeal if the appellant believes that the agency did not fully carry out the Board's Order. The petition should contain specific reasons why the appellant believes that the agency has not fully carried out the Board's Order, and should include the dates and results of any communications with the agency. 5 C.F.R. § 1201.182(a).

¶38     For agencies whose payroll is administered by either the National Finance Center of the Department of Agriculture (NFC) or the Defense Finance and Accounting Service (DFAS), two lists of the information and documentation necessary to process payments and adjustments resulting from a Board decision are attached. The agency is ORDERED to timely provide DFAS or NFC with all documentation necessary to process payments and adjustments resulting from the Board's decision in accordance with the attached lists so that payment can be made within the 60-day period set forth above.

¶39     This is the final decision of the Merit Systems Protection Board in this appeal. Title 5 of the Code of Federal Regulations, section 1201.113(c) (5 C.F.R. § 1201.113(c)).

NOTICE TO THE APPELLANT
REGARDING YOUR RIGHT TO REQUEST
ATTORNEY FEES AND COSTS

You may be entitled to be paid by the agency for your reasonable attorney fees and costs. To be paid, you must meet the requirements set out at title 5 of the U.S. Code (U.S.C.), sections 7701(g), 1221(g), 1214(g) or 3330c(b); or 38 U.S.C. § 4324(c)(4). The regulations may be found at 5 C.F.R. §§ 1201.201, 1202.202, and 1201.203. If you believe you meet these requirements, you must file a motion for attorney fees WITHIN 60 CALENDAR DAYS OF THE DATE OF THIS DECISION. You must file your attorney fees motion with the office that issued the initial decision on your appeal.

## NOTICE TO THE APPELLANT REGARDING
## YOUR FURTHER REVIEW RIGHTS

You have the right to request further review of this final decision.

Discrimination Claims:  Administrative Review

You may request review of this final decision on your discrimination claims by the Equal Employment Opportunity Commission (EEOC).  *See* Title 5 of the U.S. Code, section 7702(b)(1) (5 U.S.C. § 7702(b)(1)).  If you submit your request by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C. 20013

If you submit your request via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, NE
Suite 5SW12G
Washington, D.C. 20507

You should send your request to EEOC no later than 30 calendar days after your receipt of this order. If you have a representative in this case, and your representative receives this order before you do, then you must file with EEOC no later than 30 calendar days after receipt by your representative.  If you choose to file, be very careful to file on time.

Discrimination and Other Claims:  Judicial Action

If you do not request EEOC to review this final decision on your discrimination claims, you may file a civil action against the agency on both your discrimination claims and your other claims in an appropriate U.S. district court. *See* 5 U.S.C. § 7703(b)(2).  You must file your civil action with the district court no later than 30 calendar days after your receipt of this order.  If you have a representative in this case, and your representative receives this order before you

do, then you must file with the district court no later than 30 calendar days after receipt by your representative. If you choose to file, be very careful to file on time. If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.


FOR THE BOARD:


_____
William D. Spencer
Clerk of the Board
Washington, D.C.

|  | **DFAS CHECKLIST**<br><br>**INFORMATION REQUIRED BY DFAS IN ORDER TO PROCESS PAYMENTS AGREED UPON IN SETTLEMENT CASES OR AS ORDERED BY THE MERIT SYSTEMS PROTECTION BOARD** |
|---|---|

AS CHECKLIST: INFORMATION REQUIRED BY IN ORDER TO PROCESS PAYMENTS AGREED UPON IN SETTLEMENT CASES

## CIVILIAN PERSONNEL OFFICE MUST NOTIFY CIVILIAN PAYROLL OFFICE VIA COMMAND LETTER WITH THE FOLLOWING:

1. Statement if Unemployment Benefits are to be deducted, with dollar amount, address and POC to send.

2. Statement that employee was counseled concerning Health Benefits and TSP and the election forms if necessary.

3. Statement concerning entitlement to overtime, night differential, shift premium, Sunday Premium, etc, with number of hours and dates for each entitlement.

4. If Back Pay Settlement was prior to conversion to DCPS (Defense Civilian Pay System), a statement certifying any lump sum payment with number of hours and amount paid and/or any severance pay that was paid with dollar amount.

5. Statement if interest is payable with beginning date of accrual.

6. Corrected Time and Attendance if applicable.

## ATTACHMENTS TO THE LETTER SHOULD BE AS FOLLOWS:

1. Copy of Settlement Agreement and/or the MSPB Order.

2. Corrected or cancelled SF 50's.

3. Election forms for Health Benefits and/or TSP if applicable.

4. Statement certified to be accurate by the employee which includes:

   a. Outside earnings with copies of W2's or statement from employer.
   b. Statement that employee was ready, willing and able to work during the period.
   c. Statement of erroneous payments employee received such as; lump sum leave, severance pay, VERA/VSIP, retirement annuity payments (if applicable) and if employee withdrew Retirement Funds.

5. If employee was unable to work during any or part of the period involved, certification of the type of leave to be charged and number of hours.



**NATIONAL FINANCE CENTER CHECKLIST FOR BACK PAY CASES**

Below is the information/documentation required by National Finance Center to process payments/adjustments agreed on in Back Pay Cases (settlements, restorations) or as ordered by the Merit Systems Protection Board, EEOC, and courts.

1. Initiate and submit AD-343 (Payroll/Action Request) with clear and concise information describing what to do in accordance with decision.

2. The following information must be included on AD-343 for Restoration:

    a.  Employee name and social security number.
    b.  Detailed explanation of request.
    c.  Valid agency accounting.
    d.  Authorized signature (Table 63)
    e.  If interest is to be included.
    f.  Check mailing address.
    g.  Indicate if case is prior to conversion.  Computations must be attached.
    h.  Indicate the amount of Severance and Lump Sum Annual Leave Payment to be collected. (if applicable)

## Attachments to AD-343

1.  Provide pay entitlement to include Overtime, Night Differential, Shift Premium, Sunday Premium, etc. with number of hours and dates for each entitlement. (if applicable)

2.  Copies of SF-50's (Personnel Actions) or list of salary adjustments/changes and amounts.

3.  Outside earnings documentation statement from agency.

4.  If employee received retirement annuity or unemployment, provide amount and address to return monies.

5.  Provide forms for FEGLI, FEHBA, or TSP deductions. (if applicable)

6.  If employee was unable to work during any or part of the period involved, certification of the type of leave to be charged and number of hours.

7.  If employee retires at end of Restoration Period, provide hours of Lump Sum Annual Leave to be paid.

NOTE:  If prior to conversion, agency must attach Computation Worksheet by Pay Period and required data in 1-7 above.

The following information must be included on AD-343 for Settlement Cases: (Lump Sum Payment, Correction to Promotion, Wage Grade Increase, FLSA, etc.)

    a.  Must provide same data as in 2, a-g above.
    b.  Prior to conversion computation must be provided.
    c.  Lump Sum amount of Settlement, and if taxable or non-taxable.

If you have any questions or require clarification on the above, please contact NFC's Payroll/Personnel Operations at 504-255-4630.